**UNITED STATES of America,**

v.

**Thomas P. JASIN.**

**No. CR. A. 91–602–08.**

United States District Court,
E.D. Pennsylvania.

Aug. 8, 2002.

---

---

Robert E. Goldman, David L. Hall, Assistant United States Attorney, Philadelphia, PA, for plaintiff.

**554**

Richard L. Scheff, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Mark E. Haddad, Sidley Austin Brown & Wood, Robert Fabrikant, Sidley Austin Brown & Wood, Los Angeles, CA, for defendant.

DuBOIS, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ....................................................555

II. BACKGROUND ....................................................555

III. STANDARD OF REVIEW .............................................557

IV. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW, AND CALL WITNESSES AT TRIAL ......................................................558
 A. TRIAL COUNSEL WAS OBJECTIVELY UNREASONABLE IN HIS FAILURE TO INVESTIGATE, INTERVIEW AND CALL AT TRIAL WITNESSES WITH EVIDENCE IN SUPPORT OF DEFENDANT'S GOOD FAITH DEFENSE AS REQUESTED BY DEFENDANT ....................................................560
 1. Defendant's Allegations of Counsel's Ineffectiveness .....................561
 (a.) Imports evidence ...............................................561
 (b.) Exports evidence ..............................................562
 (c.) Technology transfer evidence ...................................563
 2. Analysis .......................................................563
 B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW, AND CALL AT TRIAL TWO EXPERT WITNESSES AND THREE FACT WITNESSES PREJUDICED DEFENDANT'S GOOD–FAITH DEFENSE ....................................................566
 1. Prejudice in Failure to Investigate, Interview, and Call at Trial Witnesses with Respect to the Imports Prong of the Conspiracy.....567
 (a.) Legitimacy of value-added concept ...............................567
 (i.) Objective reasonableness of value-added concept: testimony of Stephen Higgins .........................................568
 (ii.) Subjective belief in the value-added concept: testimony of John Kerns ..............................................572
 (b.) Factual sufficiency of value added...............................575
 (i.) Expert testimony: Robert Yates..............................576
 (ii.) Fact testimony: William Gallagher...........................577
 2. Prejudice in Failure to Interview and Call at Trial James Guerin with Respect to the Exports Prong of the Conspiracy and Overall Innocence ......................................................578
 3. Cumulative Prejudice ...........................................580

V. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO OBJECT TO THE GOVERNMENT'S USE AT TRIAL OF DEFENDANT'S STATEMENTS MADE AND DOCUMENTS PRODUCED DURING PROFFER SESSIONS ...................................582
 A. THE UNITED STATES ATTORNEY'S OFFICE'S TANDARD PROFFER AGREEMENT APPLIED TO DEFENDANT'S STATEMENTS MADE DURING PROFFER SESSIONS WITH THE GOVERNMENT....................................................583
 1. The Proffer Sessions on October 4, 1989, and April 10, 1990, Were Not Plea Related ................................................583
 2. Substance of the Proffer Agreement ...............................586
 B. THE GOVERNMENT'S USE OF DEFENDANT'S PROFFER STATEMENTS DOES NOT SUPPORT A CLAIM FOR HABEAS RELIEF.....589
 1. Governing Standard: Meaning of "Materially Different" .................589

2. Evaluation of Defendant's Cited Statements ............................ 591

VI. CONCLUSION ................................................................ 594

## MEMORANDUM

## I. INTRODUCTION

Presently before the Court are Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 (Doc. No. 230, filed Jan. 23, 2001) ("Def.'s Mot."); Memorandum in Support of Defendant's Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody [Corrected 2/12/01] (Doc. No. 241, filed Feb. 12, 2001) ("Def.'s Mem."); Government's Reply to Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 249, filed April 23, 2001) ("Gov.'s Rep."); and a number of supplemental filings.[1] An evidentiary hearing and oral argument was held on August 9, 2001.

This case involves a complex prosecution for violations of the United States arms embargo against South Africa during the 1980s. The Court issues this Memorandum and Order to address defendant Thomas P. Jasin's claims under 28 U.S.C. § 2255 that his trial counsel was constitutionally ineffective. The Court agrees with defendant on one of his two claims for relief—that his counsel was ineffective in failing to investigate, interview, and call at trial a number of witnesses who would have been helpful to defendant's good faith defense to the charges against him. The Court will, however, deny the motion on the ground stated in defendant's second claim for relief—that his trial counsel was ineffective for failing to object to the government's cross examination of defendant based on defendant's proffer statements.

## II. BACKGROUND

The facts of this case, which has been before the Court since 1991, are fully set forth in the Court's Opinion denying Defendant's Motion for Post Conviction Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure. *See United States v. Jasin*, No.Crim. A. 91–602–08, 1993 WL 259436, at *1–11 (E.D.Pa. July 7, 1993). Some facts are restated where necessary throughout the discussion section of this Memorandum. The following brief procedural history is sufficient for the present purpose of addressing defendant's habeas motion.

On October 31, 1991, a Grand Jury in the Eastern District of Pennsylvania returned a sixty-seven-count Indictment against nineteen co-defendants, three counts of which included charges against defendant Jasin—Counts I, XXIII, and XXIV. Count I charged a conspiracy to violate the Arms Export Control Act, 22 U.S.C. §§ 2778(b)(2) and 2778(c), and its

---

1. The supplemental filings include Defendant's Reply to Government's Reply to Defendant's Motion under 28 U.S.C. 2255 (Doc. No. 250, filed May 7, 2001) ("Def.'s Rep."); and Government's Surreply to Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 252, filed May 24, 2001) ("Gov.'s Sur."). The parties submitted further briefing pursuant to the Court's Order following an August 9, 2001, hearing: Government's Supplemental Memorandum Addressing Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 261, filed Sept. 5, 2001); Government's Second Supplemental Memorandum Addressing Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 263, filed Sept. 17, 2001); Defendant's Response to Government's Supplemental Memorandum Addressing Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 264, filed Sept. 24, 2001); Defendant's Response to Government's [Second] Supplemental Memorandum Addressing Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 265, filed Sept. 26, 2001); and Government's Reply to Defendant's Response to Government's Supplemental Memorandum Addressing Defendant's Motion Under 28 U.S.C. § 2255 (Doc. No. 266, filed Sept. 27, 2001).

implementing regulations, 22 C.F.R. § 121, et seq. ("AECA"); the Comprehensive Anti–Apartheid Act of 1986, 22 U.S.C. § 5001, et seq. ("CAAA"); and sections of a money laundering statute, 18 U.S.C. § 1956. Counts XXIII and XXIV charged violations of the AECA.

Jasin's case was severed and he was tried before a jury in November and December of 1992. On December 10, 1992, after a five-week trial, the jury returned a verdict of guilty on Count I of the Indictment and not guilty on Count XXIV of the Indictment. The Government had voluntarily dismissed Count XXIII before trial.

Because of lengthy post-trial proceedings involving, inter alia, the Classified Information Procedures Act, 18 U.S.C.App. 3, § 1 et seq., defendant was not sentenced until July 16, 1998. The Court departed downward from a guideline sentencing range of fifty-seven to sixty months and sentenced defendant, inter alia, to twenty-four months incarceration. United States v. Jasin, 25 F.Supp.2d 551 (E.D.Pa.1998). Defendant then appealed. The Court of Appeals, in an unreported opinion, affirmed the judgment of this Court. United States v. Jasin, No. 98–1641, slip op., 191 F.3d 446 (3d Cir. Aug.12, 1999). The Third Circuit then denied defendant's petition for en banc review. Defendant then filed a Petition For a Writ of Certiorari to the United States Supreme Court. The petition was denied on January 24, 2000. Jasin v. United States, 528

U.S. 1139, 120 S.Ct. 986, 145 L.Ed.2d 935 (2000).

Defendant thereafter filed a Motion for New Trial Pursuant to Fed.R.Crim.P. 33 Based Upon Newly Discovered Evidence. The Court denied that motion on November 21, 2000, United States v. Jasin, No. Crim. A. 91–602–08, 2000 WL 1793397 (E.D.Pa. Nov.22, 2000),[2] and directed defendant to commence service of his sentence on December 12, 2000. See United States v. Jasin, No.Crim. A. 91–602–08, 2000 WL 1886576, at *1 (E.D.Pa. Dec.11, 2000) (detailing Order regarding commencement of incarceration).

On December 5, 2000, defendant filed a pro se Emergency Motion for Stay of Imprisonment pending a decision on a motion under 28 U.S.C. § 2255 which, at the time, had not yet been filed, but which defendant represented he would file within a few weeks. The Court denied that motion on December 11, 2000. Id.

Thereafter, in December 2000, defendant reported to FCI Schuylkill to commence service of his sentence. Defendant filed the instant habeas motion on January 23, 2001; he filed a "corrected" memorandum of law in support of the motion on February 12, 2001.[3]

In his habeas motion, defendant raised three arguments in support of his requested relief—that the Court vacate and set aside the judgment of conviction and release and discharge him. The first and second of these arguments are based on

---

**2.** During the pendency of the instant habeas motion, the Third Circuit affirmed this Court's denial of defendant's Rule 33 motion. United States v. Jasin, 280 F.3d 355 (3d Cir. 2002). On June 5, 2002, defendant filed a Petition For a Writ of Certiorari with respect to the Rule 33 Motion. The Petition is still pending.

**3.** Concurrently with his § 2255 motion, defendant filed a Renewed Motion for Bail

Pending Disposition of Defendant's 2255 Motion (Doc. No. 232, filed Jan. 23, 2001). Thereafter, defendant filed his Second Renewed Motion for Bail Pending Disposition of Defendant's 2255 Motion (Doc. No. 251, filed May 9, 2001). The Court reserved decision on the two Bail Motions while considering the habeas motion; the Court's order renders the Bail Motions moot.

claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). They are that (1) trial counsel was ineffective in his failure to investigate, interview, and call potential witnesses, and (2) trial counsel was ineffective in his failure to object to the government's use at trial of defendant's statements made during proffer sessions with government representatives. In his third argument, defendant asserted that pre– and post-trial delay denied defendant's constitutional right to a speedy trial and to due process of law. Defendant withdrew this third argument by letter to the Court dated August 14, 2001, but reserved the right to re-raise it should the Court grant defendant a new trial.

After reviewing the parties' filings, the Court decided to conduct an evidentiary hearing and oral argument. During that proceeding, the Court directed the parties to brief two additional issues not addressed in the initial filings: (1) the government's argument that testimony from witnesses whom defendant alleges trial counsel was ineffective in failing to call at trial would have been cumulative to testimony adduced at trial; and (2) the government's use at trial of defendant's statements made at proffer sessions. With respect to the second issue, the government's standard proffer agreement permitted use of proffer statements only if a defendant's trial testimony was "materially different" from the proffer. Because defendant argued that the statements used by the government at trial were not "materially different" from defendant's trial testimony, the Court ordered the government to provide record citations to defendant's trial testimony which the government believed was "materially different" from the proffer session statements.

Supplemental memoranda covering the aforesaid issues were thereafter filed. The Court will consider them together with all of the other filings and the evidence adduced at the hearing on August 9, 2001, in deciding the § 2255 motion.

### III. *STANDARD OF REVIEW*

Under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), it is well-settled that, in order to establish a claim for ineffective assistance of counsel at trial, a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. 2052, and (2) that counsel's deficient performance prejudiced the defense. *Id.* at 693, 104 S.Ct. 2052. As explained by the Supreme Court in *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. 2052. The ultimate focus of the *Strickland* inquiry is always on the "fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. 2052.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, the Court must examine "whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688, 104 S.Ct. 2052. The reasonableness analysis must be viewed against the backdrop of counsel's most basic duties, which include a duty to consult with the defendant on important decisions, to keep the defendant informed of important developments in the prosecution and "to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* An obvious means of ensuring such a reliable adversarial testing

process is for counsel to investigate the facts and circumstances of the case. If counsel develops trial strategy "after thorough investigation of law and facts relevant to plausible options," such strategy is "virtually unchallengeable." *Id.* at 690–91, 104 S.Ct. 2052. On the other hand, "strategic choices made after less than complete investigation" are only reasonable "to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91, 104 S.Ct. 2052. In sum, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052.

As to the *Strickland* prejudice prong, the Court's inquiry must focus on whether defendant has demonstrated "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Importantly, this standard does not require a defendant to "show that counsel's deficient conduct more likely than not altered the outcome of the case." *Id.* at 693, 104 S.Ct. 2052. The emphasis, again, is on *reasonable probability*. In light of this reasonableness standard, the Court's analysis is governed by the fact that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696, 104 S.Ct. 2052.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW, AND CALL WITNESSES AT TRIAL

Defendant argues that his trial counsel was ineffective because he inexplicably failed to interview and call at trial a number of fact witnesses defendant told him would provide testimony helpful to his defense, and he likewise failed to seek out expert witnesses requested by defendant. Defendant asserts that these failures were so prejudicial as to create a reasonable probability that the result of the trial would have been different had counsel followed through on defendant's requests. Counsel's errors were magnified, defendant argues, by the fact that the government had a "weak" or "thin" case against defendant and the fact that the case was a "close" one.

The government argues in response that trial counsel presented a skillful defense. Even if counsel's failure to interview or call certain witnesses was objectively unreasonable, the government argues, given the government's strong case against defendant, counsel's ineffective assistance did not sufficiently meet the *Strickland* prejudice standard.

Defendant cites a number of cases in support of his argument that trial counsel's failure to interview or investigate witnesses constituted ineffective assistance of counsel. The most pertinent of these cases is *United States v. Gray*, 878 F.2d 702 (3d Cir.1989).[4]

---

4. The other decisions cited and discussed by the parties include *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Chambers v. Armontrout*, 907 F.2d 825 (8th Cir.1990); *Code v. Montgomery*, 799 F.2d 1481 (11th Cir.1986); *Nealy v. Cabana*, 764 F.2d 1173 (5th Cir.1985); and *Goodwin v. Balkcom*, 684 F.2d 794 (11th Cir.1982).

Because *Gray* is the law of this Circuit, and, moreover, because its analysis is quite analogous to that required in the present case, *Gray* is the only case the Court will discuss in great detail.

The Court notes that *Gray* remains good law. *See Stevens v. Del. Corr. Ctr.*, 295 F.3d 361, 373–74 (3d Cir.2002) (discussing *Gray*).

In *Gray*, the defendant was indicted for possession of a firearm as a convicted felon. *Id.* at 704. At his trial, the defendant admitted possession of the firearm, but asserted a self-defense claim and maintained that he had taken possession of the firearm from an assailant during a physical altercation with that assailant. *Id.* Approximately twenty to twenty-five people witnessed the fight. *Id.*

Before the trial in *Gray*, the defendant met with his attorney who instructed the defendant to obtain the names of potential witnesses to the incident, and he did so, providing counsel with four names. *Id.* at 707. Once the defendant gave counsel four names, counsel did not ask how the witnesses could be contacted, but instead instructed the defendant to bring the witnesses to counsel's office for interviews, and, if appropriate, preparation for trial testimony. *Id.* The defendant did not do so, but, at trial, the defendant attempted to secure the presence of three witnesses about whom he had informed counsel; none of the witnesses appeared. Although the defendant was aware that his attorney had the authority to subpoena witnesses, he " 'wasn't real anxious' to ask him to do so, instead feeling that he should comply with [counsel's] instructions to secure the voluntary presence of as many witnesses as he could." *Id.* The trial resulted in a conviction. The defendant thereafter filed a habeas petition alleging ineffective assistance of counsel on the ground that his lawyer failed to investigate, interview, and call at trial the four witnesses he identified.

Addressing the defendant's petition, the Third Circuit explained, in its application of the first *Strickland* prong, that "failure to conduct any pretrial investigation gen-erally constitutes a clear instance of ineffectiveness," because, "in the context of complete failure to investigate ... counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Id.* at 711 (citing *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052).[5] The court found such a "complete failure to investigate" in the case before it, explaining that "counsel offered no strategic justification for his failure to make any effort to investigate the case" and that counsel "could have offered no such rationale." *Id.* According to the *Gray* court, the mere fact that the defendant preferred not to subpoena witnesses did not change the circumstances. The client's reluctance, the court stated, "did not absolve [counsel] of his independent professional responsibility to investigate what information these potential witnesses possessed, even if he later decided not to put them on the stand." *Id.* at 712.

Turning to the second prong of the *Strickland* analysis, the Third Circuit concluded that, of the more than twenty-five potential witnesses to the altercation leading to the defendant's arrest who might have supported the defendant's self-defense claim, the potential testimony of *one* witness—of whom counsel was aware and failed to investigate—was sufficient to establish that counsel's ineffective conduct prejudiced the defendant. Among other reasons, the court said the witness' testimony would have been helpful to the defense because it would have provided a disinterested, objective view to corroborate the defendant's testimony. *Id.* at 714, 104 S.Ct. 2052.

---

**5.** *See also United States v. Kauffman,* 109 F.3d 186, 190 (3d Cir.1997) (stating that, under *Strickland,* although "counsel is entitled to substantial deference with respect to strategic judgment, an attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation").

The *Gray* court's analysis is particularly relevant to defendant's claims in this case. In *Gray*, the court found ineffectiveness in counsel's failure to investigate and/or interview witnesses even though his client was hesitant to subpoena them. This case, defendant argues, is more extreme than *Gray* because defendant specifically asked that trial counsel interview witnesses, but trial counsel inexplicably made no effort to do so. Additionally, the *Gray* court found prejudice in the failure to call one witness. Defendant again argues that his case is more extreme than *Gray* because of trial counsel's failure to investigate and/or interview numerous witnesses who could have aided defendant's trial defense.

With these guiding principles, the Court will assess defendant's claims in the two steps dictated by *Strickland:* (1) the objective reasonableness of counsel's conduct, and (2) the prejudice resulting from any objectively unreasonable conduct. For the reasons stated in the following analysis, the Court concludes that defendant's motion should be granted because of trial counsel's failure to investigate, interview, and call at trial a number of witnesses.

## A. TRIAL COUNSEL WAS OBJECTIVELY UNREASONABLE IN HIS FAILURE TO INVESTIGATE, INTERVIEW AND CALL AT TRIAL WITNESSES WITH EVIDENCE IN SUPPORT OF DEFENDANT'S GOOD FAITH DEFENSE AS REQUESTED BY DEFENDANT.

■ At trial, the government endeavored to prove that defendant was involved in three different prongs of a larger conspiracy to violate the Arms Export Control Act and the Comprehensive Anti–Apartheid Act of 1986. The three prongs of the conspiracy were: (1) the illegal importing of surrogate missiles from South Africa to the United States, (2) the illegal exporting of United States missile components to South Africa for integration into South African missiles, and (3) the illegal transfer to South Africa of technical data derived from United States-based flight testing of missiles originally produced in South Africa.

Defendant's defense to all three prongs of the charged conspiracy was that he acted in good faith. Defendant sought to prove—and he argued to the jury—that he held an honest belief that he was acting in compliance with the law. Accordingly, defendant argued, he lacked the willful state of mind required to establish a violation of the relevant law. The Court charged the jury in accordance with this defense, explaining that defendant's good faith was a "complete defense ... because good faith on the part of the defendant is simply inconsistent with the intent to commit the crime charged." Trial Transcript ("T."), Dec. 4, 1992, at 100; App. at 3496.[6]

In his habeas motion, defendant asserts that he asked that trial counsel investigate and interview a number of witnesses to support his good-faith defense. Defendant's requests went beyond mere oral inquiries; he made some of his requests in writing and faxed them to trial counsel. *See* Def.'s Exs. 10–15; *see also* Defendant's Jan. 29, 2001, Declaration, Def.'s Ex. 43 ("Def.'s Decl.") at ¶¶ 9–10 (defendant's declaration explaining defendant's request of counsel to conduct a "thorough investigation and interview all persons who

---

**6.** In their filings, the parties cite to the record by referring to the Appendix (App.) to defendant's direct appeal. Because that appendix was never docketed with the District Court Clerk, the Court will supply in this memorandum parallel citations to the original trial transcripts and the Appendix.

would help show that I acted in good faith").

Below, the Court will recount defendant's arguments as to each prong of the conspiracy and then set forth its analysis supporting the conclusion that trial counsel was indeed ineffective.

### 1. Defendant's Allegations of Counsel's Ineffectiveness

#### (a.) Imports evidence

The imports prong of the conspiracy involved charges that defendant and defendant's employer, International Signal and Control Corporation ("ISC"), illegally imported into the United States South African surrogate missiles, or missile dummies,[7] as part of ISC's Striker missile program. A central issue with respect to this prong of the conspiracy was the classification of the missile dummies' country of origin. Under the regulations governing importation of defense articles, anyone seeking to import defense articles was required to complete a Bureau of Alcohol, Tobacco and Firearms ("ATF") application form, which asked the country of origin of the defense articles.[8] At the relevant time period, a United States embargo prohibited the importation of defense articles that were classified as originating in South Africa. At trial, the government adduced evidence supporting its argument that the missile dummies ISC imported were South African in origin.

Defendant, however, testified at trial that he had a good-faith belief that, under the governing rules, the imported missile dummies were properly classified as Italian in origin. This statement was based on the fact, as defendant testified, that South African producers shipped incomplete missile dummies to Italy, where an Italian company, Elmer, added components in assembling the missile dummies that were ultimately imported into the United States. Because the Italian company added components, and, thus, financial value, to the missile dummies, defendant alleged that under a "value added" theory, the proper country of origin for the missile dummies was Italy.

To support this defense, defendant requested that trial counsel call witnesses to testify as to (1) the legitimacy of the value-added concept—that is, whether it was a proper interpretation of the governing regulations, and (2) whether, assuming the legitimacy of the value-added concept, sufficient value was added to the missile dummies to render them Italian in origin. In an August 6, 1992 memorandum faxed to trial counsel, defendant wrote: "I want to have expert witnesses on the value added. An ATF expert would be very good and a State Dept AECA expert. A USG[9] military missile expert could explain the value and function of the Elmer modifications." Def.'s Ex. 13. In that same memorandum, defendant asked trial counsel to "interview the Sikorsky[10] people—especially Gallagher and Kerns," who, defendant believed, would corroborate his good faith with respect to the illegal import charges. *Id.*

Defendant also argues that trial counsel should have interviewed a key prosecution

---

**7.** The conspiracy did not involve the importing of fully operational missiles armed with warheads. Rather, it involved missile dummies, which are missile bodies weighted and balanced to simulate an operational missile. ISC sought to import the missile dummies to test them for flight irregularities.

**8.** Testimony at trial established that the rules governing importation of operational missiles

applied in the same manner to missile dummies.

**9.** United States Government.

**10.** The Sikorsky Aircraft Division of United Technologies Corp. had agreed to work with ISC on the testing of the imported missile dummies.

witness, Sandra Stehman, who testified on cross examination by trial counsel, *inter alia,* that defendant would be lying if he said that he wanted to import the missile dummies legally. *See* T., Nov. 12, 1992, at 122; App. at 764. Defendant asserts that he specifically asked trial counsel to interview Stehman. Def.'s Decl. at ¶ 10. Additionally, at some point before trial, defendant supplied trial counsel with a list of twenty-eight witnesses whom he believed might testify at trial. Def.'s Ex. 11; *see also* Def.'s Decl. at ¶ 17 (defendant's declaration that he sent the list of witnesses to trial counsel). On this list, defendant gave trial counsel his evaluation of whether a potential witness would provide "helpful" or "hurtful" testimony. Stehman was one of only two witnesses on the list whose testimony defendant rated as "hurtful," explaining that "since she got an immunity deal she just might say what the USG wants her to say." Defendant argues that trial counsel should have interviewed Stehman in light of his request.

### (b.) Exports evidence

The government argued at trial that defendant was part of the ISC conspiracy's efforts to export components, including batteries and xenon bulbs, to South Africa for integration into South African missiles. Defendant's defense with respect to this prong of the conspiracy was that his superior at ISC, James Guerin,[11] the leader of the ISC conspiracy, told defendant that ISC had "Washington approval" for the export program. T. Nov. 24, 1992, at 70–71; App. at 2218–19 (defendant's testimony that Guerin assured him of ISC's "special channels and Washington approval" in relation to the export activity).

On at least two occasions, defendant specifically asked trial counsel to interview Guerin to assess whether Guerin could testify at trial to corroborate defendant's good-faith defense. First, on October 2, 1992, defendant faxed to trial counsel a copy of a letter from Guerin addressed to the Court. *See* Def.'s Ex. 14 at 52. That letter explained how Guerin "implied" to defendant that ·he had "Washington's 'blessings'" for the shipments of missile components to South Africa. *Id.* Additionally, in the letter, Guerin asserted his belief that defendant had no knowledge of "*any* of the offenses for which I was charged." *Id.* (emphasis supplied). Guerin concluded the letter by questioning the government's efforts to prosecute defendant: "Frankly, I have been somewhat mystified as to why charges have been brought against him at all." *Id.* On the cover page of the fax defendant sent to trial counsel, defendant wrote that the letter "provides a basis for exculpatory testimony by Guerin. Please ask him the questions I gave you, which in addition to your questioning, should get at the truth and prove my innocence." *Id.* at 50.

Defendant's second communication to trial counsel regarding Guerin was on October 24, 1992. On that date, defendant sent a fax containing the message: "There are only a few weeks left before trial. *Please* at least telephone Guerin so you can determine what kind of a witness he will make." Def.'s Ex. 15 (emphasis supplied).

In addition to asking trial counsel to interview Guerin, defendant sought another witness with respect to his defense to the exports prong of the conspiracy charges-a handwriting expert to counter the government's introduction of a faxed memorandum explicitly referencing ISC's supplying components to South Africa, a statement damaging to the defense. The

---

**11.** Guerin, who was named in a separate Indictment from that naming defendant, pled guilty to the charges against him and was sentenced to fifteen years in prison.

memorandum was signed with the name "E.M. Blumenthal," a name which the government claimed defendant wrote. At trial, the government introduced the testimony of a handwriting expert who testified that defendant "may have signed" the letter as E.M. Blumenthal. *Jasin,* 1993 WL 259436, at *6. Defendant did not introduce any evidence in rebuttal.

Defendant asserts that, before trial, he asked trial counsel to investigate handwriting experts to support his case. Specifically, on October 20, 1992, defendant faxed to trial counsel the following note: "I know you have been busy. Since I have not heard back from you on getting a handwriting expert and trial is getting near, I met with a John Gencavage who is an expert & used to be an examiner for ATF & was the top guy for the Pa. State Police. Attached is his resume. He said his rate is $110 per hr ($550 min). If you don't have someone else at this stage, please contact Mr. Gencavage to get the ball rolling." Def.'s Ex. 12. Trial counsel failed to follow up with Gencavage or seek out another handwriting expert.

#### (c.) Technology transfer evidence

The government argued with respect to the third prong of the conspiracy that defendant acted to transfer to South Africa technological data obtained from United States testing of Striker missiles. Defendant argues that the testimony of Eloy J. Torrez, the former president of ISC Aerospace, a subsidiary of ISC, would have supported defendant's claim that he acted in good faith in his handling of the technological data. Other than listing Torrez in his compilation of potential witnesses discussed above, *see* Def.'s Ex. 11, defendant does not argue that he specifically requested trial counsel to contact and/or interview Torrez.

#### 2. Analysis

The sum total of the documentary and other evidence establishes that defendant asked trial counsel to interview four witnesses—Kerns and Gallagher with respect to imports and Guerin and Gencavage with respect to exports. The evidence also shows that defendant asked trial counsel to investigate three expert witnesses with respect to his value-added defense to the import-related charges—an ATF expert, a State Department AECA expert, and a United States government military missile expert. Finally, the documentary evidence shows that defendant identified, without specifically requesting that trial counsel conduct interviews, two witnesses whom defendant alleges trial counsel should have interviewed—Torrez and Stehman.

Defendant argues in his motion that, notwithstanding these requests, trial counsel failed to interview *a single* witness in preparation for trial. Instead of following up on defendant's recommended pre-trial investigation, defendant alleges that trial counsel "discouraged [defendant] from making suggestions concerning trial preparation" and "frequently rejected [his] suggestions and questions with caustic comments and in anger." Def.'s Decl. at ¶ 11. Shortly before trial, defendant asserts, trial counsel informed defendant that he was only planning to present one witness in defendant's case—defendant himself. *Id.* at ¶ 12. Defendant then identified three witnesses whom he knew would willingly testify on his behalf: Frank L. Ritter, General Robert W. Pointer, Jr., and David B. Ellis. *Id.* Counsel also called, as on cross examination, James Shinehouse. According to defendant, trial counsel did not interview these witnesses, but instead relied on defendant "to tell him what the witnesses would say." *Id.*[12]

**12.** With the exception of the government's various arguments that the testimony defen-

The Court finds support for defendant's allegations in at least two portions of the trial record. First, during a sidebar discussion with the Court concerning the testimony of defense witness James Shinehouse, trial counsel informed the Court that "I never talked to this man" and "I don't know what he is going to say." T., Nov. 30, 1992, at 147; App. at 2657. Second, in another sidebar conversation, the Court explicitly told counsel that Guerin's testimony concerning what he told defendant about "Washington approval" was relevant and that "if you want to bring in another defense witness, Guerin strikes me as the logical person." T., Nov. 30, 1992, at 114; App. at 2624. Even after the Court's question asking counsel "[w]hy don't you bring Guerin in?" and the government's offer to transport Guerin from a federal prison in Florida to the trial, see T., Nov. 30, 1992, at 116; App. at 2626, trial counsel did not produce Guerin.

Whether trial counsel actually ignored defendant's requests that he investigate the facts and circumstances of the case, as defendant now alleges, is a factual question for the Court to decide. See 28 U.S.C. § 2255 ("[T]he court shall ... make findings of fact and conclusions of law with respect [to a motion under the statute]."). As support for many of his arguments that trial counsel failed to conduct any investigation into the facts and circumstances of the case, defendant relies solely on his own declaration. In evaluating these arguments, the Court is mindful of the government's repeated challenges to defendant's credibility. See Gov.'s Rep. at 6 ("The government at trial challenged the veracity of Jasin and continues to do so. Therefore, Jasin's assertions as to alleged facts contained in his affidavit are contested by the government."). On the other hand, defendant supports a number of his claims with documentary evidence. Moreover, the Court finds the two record excerpts of trial counsel's sidebar colloquies with the Court discussed above supportive of trial counsel's failure to conduct pre-trial investigation.

In a typical case, to determine whether trial counsel conducted no pre-trial investigation or interviews, the Court would weigh defendant's evidence against any contradictory evidence presented by the government. This case is, however, atypical because the government has produced no such evidence.[13] In habeas cases like this one where a defendant is arguing that his or her trial counsel failed to investigate, interview, and call witnesses, the government customarily produces an affidavit or testimony from trial counsel explaining his or her strategic decision-making process. See, e.g., Gray, 878 F.2d at 708–09 (discussing evidentiary hearing where government presented trial counsel's testimony concerning his trial strategy). In this case, however, the government produced no such affidavit and expressly declined to call trial counsel at the August 9, 2001, evidentiary hearing, as evidenced in the following colloquy between the Court and counsel:

dant presented in his habeas motion is cumulative to the evidence defendant presented at trial, the testimony of Ritter, Pointer, Ellis, and Shinehouse is largely inconsequential to the issues before the Court.

**13.** The government's argument that trial counsel was effective in calling four witnesses and presenting an affidavit and that trial counsel "with great skill" used government

witnesses as his own to bring out evidence supporting defendant, Gov.'s Reply at 19–20, is inapposite to defendant's present claim. Defendant is not arguing that trial counsel was an ineffective advocate in his examination of witnesses who did testify. Rather, defendant is arguing that trial counsel was ineffective in failing to present testimony helpful to a good-faith defense.

THE COURT:....I don't know all of the witnesses you will be calling today and I want their names, but I think [trial counsel] will be called as a witness, am I correct?

MR. HADDAD [for defendant]: He will not, your Honor, that I know of. We have no reason to call him, I think it would be up to the Government to decide if they need his testimony.

THE COURT: On the question of trial strategy and why a witness was called or not called, or why a witness was called without an interview or why a witness of the Government was not interviewed, that's the burden on the Government, is that-

MR. HADDAD: That's correct. Typically of these cases, your Honor, the Government contacts the defense attorney, obtains an affidavit, says—the defense attorney says, well, here are all of my strategic considerations. That was not done in this case, they are not—to my knowledge, at no time have they told me they're presenting [trial counsel], and I have told them that I have not contacted him and that was—he's certainly not part of our case

. . . .

THE COURT:....But there's something else, and that is the traditional course that the Government takes in a case like this, and that is to present some testimony regarding trial strategy and why a defense lawyer did or did not do something. Did I mislead you, Mr. Goldman and Mr. Haddad, into thinking—

MR. GOLDMAN [for the government]: Oh, not at all.

THE COURT:—that you could not call [trial counsel]?

MR. GOLDMAN: Absolutely not, your Honor, we both know we could call [trial counsel]. I—frankly, I guess [trial counsel] is one of those witnesses that

neither side wants to call. And the Government's position is that [trial counsel] explained his trial strategy at the suppression motion and, that being, I raised a legal issue, I consulted with Mr. Martin, prior counsel, on the issue, Mr. Martin has confirmed the Government's position in its pleadings and, based upon that, I'm withdrawing the motion to suppress the proffer statements.

THE COURT: All right. Now, that's limited to the motion to suppress and what I'm talking about transcends that, goes beyond that, what I'm talking about is calling—

MR. GOLDMAN: All the issues?

THE COURT: Yes. Now, did I mislead you in that regard?

MR. GOLDMAN: Not at all, your Honor. It's our position that the Court has—I assume it's the position also of both sides is that the Court has in the pleadings on the other issues the information that you need to make a decision.

THE COURT: All right.

MR. GOLDMAN: No, you didn't mislead—

THE COURT: But I want it clear that nothing that I said was intended to communicate to either of you that you could not call the—I guess it's just trial counsel or the attorney representing—whoever represented Mr. Jasin at the time to testify as to why he did or did not do something—

MR. GOLDMAN: That's correct.

August 9, 2001, Evidentiary Hearing and Oral Argument Transcript ("Hr'g T.") at 13–19.

This colloquy makes it abundantly clear that, on the question of counsel's trial strategy, the government is relying solely on the written submissions. As previously stated, those filings demonstrate *nothing* about trial counsel's decision-making pro-

cess with regard to trial strategy. With no evidence showing that trial counsel actually conducted the investigation that defendant requested, let alone any investigation at all, the Court is left to rely on the evidence defendant presented. That evidence leads the Court to find, as a matter of fact, that trial counsel conducted no pretrial investigation and interviewed neither the witnesses defendant asked him to interview nor the witnesses he actually presented. The seriousness of this dereliction is explained, but certainly not excused, by the fact, disclosed to defendant at the beginning of trial, that trial counsel had never tried a criminal case before this ·one.

Upon this finding of fact, the question of trial counsel's ineffectiveness is dictated by the well-established principles enunciated in *Gray:* "Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." *Gray,* 878 F.2d at 711. Accordingly, the Court concludes that trial counsel's "failure to conduct any pretrial investigation ... constitutes a clear instance of ineffectiveness." *Id.* Thus, defendant has satisfied the first prong of *Strickland* with respect to his claim that counsel failed to investigate, interview, and call at trial witnesses with evidence in support of defendant's good-faith defense.

## B. TRIAL COUNSEL'S FAILURE TO INVESTIGATE, INTERVIEW, AND CALL AT TRIAL TWO EXPERT WITNESSES AND THREE FACT WITNESSES PREJUDICED DEFENDANT'S GOOD–FAITH DEFENSE.

■ Defendant argues that the cumulative prejudice of trial counsel's failure to investigate and/or interview witnesses was "huge" and therefore justifies the granting

of habeas relief. Defendant also points out that the Court's analysis of the prejudice issue must take into consideration the fact that this was a close case—a conclusion that defendant supports by pointing to the jury's five-day deliberations and the Court's own comments describing the case as a "close" one. *See* T., Nov. 20, 1992, at 8; App. at 1726 (Court's commentary that "[i]t's a close case" in denying defendant's motion for judgment of acquittal).

The government's responsive arguments on prejudice address each of the witnesses whom defendant argues his counsel was ineffective in failing to investigate, interview, or call. In summary, the government contends that even had trial counsel thoroughly investigated the leads provided by defendant, and, even had trial counsel called additional witnesses, the evidence against defendant would have led the jury to reach the same result—a guilty verdict.

Upon reviewing the parties' arguments and their citations to the record, the Court concludes that trial counsel's conduct resulted in prejudice to defendant. The Court's conclusion is limited to those witnesses who would have supported defendant's good faith as to two of the three prongs of the conspiracy: imports and exports.

With respect to imports, the Court finds prejudice in counsel's failure to follow up on defendant's request that he find an ATF expert and a United States government military missile expert. The prejudicial effect of trial counsel's failure in this respect is demonstrated by the affidavits, appended to defendant's habeas motion, of Stephen Higgins, a former director of ATF, and Robert Yates, a military missile expert. Had trial counsel investigated such witnesses, and, had he found expert witnesses like Higgins and Yates, those witnesses would have been able to present testimony helpful to explain defendant's

good-faith belief that the importation of Striker missile dummies was legal under a value-added theory. The Court also finds prejudice with respect to imports in trial counsel's failure to interview John Kerns and William Gallagher, the representatives of Sikorsky who worked with defendant, and who also would have provided evidence supportive of defendant's good-faith defense.

With respect to exports, the Court finds prejudicial counsel's failure to interview Guerin, the leader of the ISC conspiracy, who would have offered evidence as to defendant's good faith belief that ISC was exporting missile components with the federal government's approval. Moreover, and perhaps even more important to defendant's case, Guerin's testimony would have called into doubt defendant's involvement in any illegal activity at all.

The Court does not find prejudicial counsel's ineffectiveness with respect to the other witnesses cited by defendant (Sandra Stehman, John Gencavage, and Eloy Torrez). Nevertheless, counsel's failure to interview and call Kerns, Gallagher, and Guerin, and failure to investigate the availability of expert witnesses such as Higgins and Yates, is more than sufficiently prejudicial to compel the Court to grant defendant's motion.

### 1. Prejudice in Failure to Investigate, Interview, and Call at Trial Witnesses with Respect to the Imports Prong of the Conspiracy

Throughout trial and in its closing argument, the government made defendant's involvement in the Striker conspiracy a central part of its case. The government argues that defendant's purported belief in the value-added concept was false and did not amount to good faith. There are two elements to the government's argument. First, the government asserts that the value-added concept is an illegitimate one

that plays no role in determining the country of origin of defense articles, and, accordingly, could not support defendant's belief that importation of the missile dummies was legal. Second, the government argues that, even if value-added were a legitimate concept, defendant could not have acted in good faith in this case because there was insufficient value added to change the imported missile dummies' country of origin from South Africa to Italy. In response, defendant contends that the witnesses trial counsel failed to investigate or interview would have provided testimony directly rebutting the government's two arguments. The Court addresses defendant's responses to the government's arguments in turn.

### (a.) Legitimacy of value-added concept

At trial, defendant was the only witness to testify that value added was a legitimate concept. The government, in its closing argument, placed great emphasis on the lack of evidence corroborating defendant's testimony as to his good faith beliefs, stating: "There has been no testimony of any witness you have heard" concerning value added. T., Dec. 3, 1992, at 77; App. at 3289. Defendant's value-added testimony, the government argued, was "absurd," T., Dec. 3, 1992, at 74; App. at 3286, and defendant was seeking to "suck ... the jurors into" an unbelievable analysis: "Mr. Jasin wants you to believe, by adding a little telemetry to this, it makes it Italian. Mr. Jasin would probably tell you that if I put a Sony stereo in my old Ford pickup truck, that I drive a Honda." T., Dec. 3, 1992, at 176; App. at 3388. The government also supported its argument on the unbelievability of defendant's testimony by pointing to the Court's authority:

And when you listen to the instructions on the law by the Judge, listen. You'll hear that there's no provision in the law for this value added concept. I would

submit to you that the only thing that has been added to, and added to, and added to in this case is Thomas Jasin's testimony.

T., Dec. 3, 1992, at 176; App. at 3388. In sum, the government argued, "the whole value added concept is simply a concoction, a subterfuge, a way around the law." T., Dec. 3, 1992, at 76; App. at 3288.

The government's arguments as to the legitimacy of the value-added concept amounted to two separate arguments: first, that defendant's belief, if he did indeed hold such a belief, was not objectively reasonable because it was not supported by the law, and, second, defendant did not hold a subjective belief in the value-added concept as evidenced by the fact that no other witnesses testified as to facts corroborating defendant's testimony.

In his habeas motion, defendant presents two witnesses who could have testified to the legitimacy of the value-added concept. The first, an expert whom trial counsel could have found upon reasonable investigation, is Stephen Higgins, whose testimony would have supported the objective reasonableness of defendant's belief in the value-added concept. The second is John Kerns, whom defendant asked trial counsel to interview, and who would have provided testimony rebutting the government's argument that defendant had no subjective belief in the legitimacy of the value-added concept.

### (i.) Objective reasonableness of value-added concept: testimony of Stephen Higgins

As the parties discuss in their filings, the Court addressed at trial the question of whether value added was indeed a legitimate concept. In a mid-trial argument outside the presence of the jury, defendant's trial counsel presented the affidavit of Vernon D. Acree, a former Commissioner for the United States Customs Service,

and a number of Customs Service rulings alleged to govern the legality of importing arms under the AECA. See Def.'s Ex. 7 (affidavit without attachments). Acree's affidavit explained how the Customs Service would determine the country of origin of a defense article "where multiple countries have provided components for an article that is to be imported into the United States." Id. at ¶ 5. In the affidavit, Acree asserted the Customs Service would consider the value added approach described in defendant's testimony, id. at ¶ 5, and stated that he was "personally familiar with rulings by the United States Customs Service approving for import articles which have as component parts and or subassemblies manufactured or supplied by manufacturers within embargoed countries." Id. at ¶ 6.

Trial counsel presented Acree's affidavit in an effort to convince the Court to charge the jury on the value-added concept. See T., Dec. 1, 1992, at 229; App. at 2953 (trial counsel's mid-trial argument to the court: "We've got all of this evidence that value added is there. And then the Judge, of course, gives the law and there isn't a word of law in there that says value added is a concept recognized.").

The government responded to trial counsel's request for a charge on value added by arguing that Customs Service practices, which trial counsel cited as support for his argument, were irrelevant: "Customs has no jurisdiction in connection with the regulations regard[ing] imports or exports." T., Dec. 1, 1992, at 237; App. at 2961. Rather, the government argued, the agency whose rules would have governed importation of the Striker missile dummies, was ATF. See id. (government's assertion that "ATF has the enforcement responsibility with defense articles and services, imports").

After considering the parties' arguments, the Court concluded as follows:

I have carefully considered the legal issue for me, which is whether the customs regulations should be considered, and should be the subject of a charge to the jury with respect to the subject of value added, or substantial transformation.

And I have concluded under the facts of this case that the answer to that question is no, that the Arms Export Control Act, does not pick up any definitions that might be included in the customs statutes and regulations that were submitted to the Court.

T., Dec. 2, 1992, at 181–82; App. at 3187–88. Under the Court's ruling, to support his claim that value added was a legitimate concept, defendant would have had to present evidence and argue that ATF practices supported his position.

Significantly, defendant argues in the instant habeas motion that, had trial counsel acted diligently and followed defendant's explicit requests transmitted to counsel before trial, *see* Def.'s Ex. 13 (requesting an ATF expert), defendant would have been able to provide exactly such support. Had trial counsel followed up on the request to investigate an ATF expert, defendant argues counsel should have found Stephen E. Higgins, who worked with ATF for thirty-two-and-one-half years and who served as ATF's Director from 1982 to 1993. Defendant appends to his motion an affidavit from Higgins, in which Higgins explains how ATF would have addressed the missile dummies' country of origin. Def.'s Ex. 2.

Higgins' testimony would have filled the gap that existed in defendant's trial defense: he states in his affidavit that the ATF would have considered the value added concept in the same manner as stated in Acree's affidavit describing Customs Service practices. This is because "where there is a question with respect to the proper classification or categorization of items to be imported … ATF would look to U.S. Customs for guidance when the terms in question are not specifically defined in ATF laws or regulations." *Id.* at ¶ 6. The described ATF practice would have had direct application in this case "where a question arose as to the true country of origin and manufacture, since to my knowledge those terms are not defined either in the instructions that accompany the forms or in the applicable laws and regulations covering such activities." *Id.*

Higgins' affidavit continues to explain that under Customs Service practices, when "multiple countries have provided components for an article that is to be imported into the United States, if the last country of export prior to importation has 'substantially transformed' the article in question, then that country and the manufacture within that country are properly designated on ATF Form 6A for Customs purposes." *Id.* at ¶ 7.[14] Under Customs rulings, "[s]ubstantial transformation is defined as an increase of 35% in labor and material costs (value) to the pre-transformation value of an object." *Id.* Because, to his knowledge, the ATF had no rules or regulations governing the country of origin entry on ATF Form 6A, it is Higgins' "professional opinion based on 32½ years experience in ATF, that ATF's position would have been to accept the Customs rulings." *Id.*

Higgins' affidavit thus demonstrates quite clearly how trial counsel's lack of diligence prejudiced defendant. Had trial counsel investigated an ATF expert, as explicitly requested by defendant, and had he found either Higgins or the information contained in Higgins' affidavit,[15] he would have been able to rebut the government's

---

**14.** ATF Form 6A is the application for permission to import a defense article.

**15.** The government makes much of the fact that defendant relies on after-the-fact affida-

argument that Acree's affidavit and the Customs Service rulings cited by trial counsel were inapplicable. Higgins' affidavit demonstrates the exact opposite—because ATF had no specific rules on the topic, Customs Service practices *would* have been relevant to the determination of the country of origin of the imported missile dummies.

Had trial counsel presented this material, the Court may or may not have decided to charge the jury on the value-added concept. But, it is Higgins *testimony*—and not a potential charge—on the applicable standards in determining a defense article's country of origin that would have provided substantial support to defendant's good-faith defense. As discussed above, the government argued in its closing that defendant was the *only* person to testify about the value-added concept. Had Higgins, or any other person, testified that ATF would have followed Customs Service practices of looking at the increase in value generated by work on a defense article in a second country, the government would not have been able to make this argument.

Moreover, notwithstanding the government's argument that Higgins' affidavit is incorrect as a matter of law, Higgins' testimony on this issue would have been admissible at trial. If nothing else, Higgins' affidavit, particularly in its reference to the absence of ATF rules on country of origin, shows that reasonable professionals experienced with ATF regulations could disagree about the governing law As defendant points out, in cases where the law may be unclear and where the defendant asserts a good-faith belief in compliance with the law, evidence as to interpretations of the law is admissible. Defendant's argument is based on a Fifth Circuit decision in which the court held: "[e]xpert testimony may be particularly appropriate when specialized areas of law . . . are at issue." *United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir.1994). In *Cavin*, the court reversed a conviction of a lawyer for participating in his client's fraudulent transactions on the basis that the trial court improperly excluded expert testimony as to the law governing the transactions. The import of *Cavin* in this case is that an expert's testimony concerning the state of the law as to importation of defense articles is admissible as it relates to the defendant's "understanding and resulting state of mind." *Id.*[16]

---

vits to support his claims, arguing that there is no evidence that defendant would have been able to locate these witnesses to present their testimony at trial. This is certainly true. Nevertheless, it is the very nature of a habeas motion claiming trial counsel's failure to investigate, that the *Strickland* prejudice analysis will be somewhat hypothetical. When a movant under § 2255 claims that trial counsel conducted no investigation whatsoever, it is impossible to say with certainty that witnesses who might have been found after investigation would have been available to testify at trial. The logical conclusion of the government's argument would prevent parties raising *Strickland* claims from ever demonstrating prejudice through the affidavits of witnesses not contacted by ineffective trial counsel. The Court concludes that *Strickland,* and its emphasis on a "reasonable probability" of a different result at trial but for a lawyer's ineffectiveness, counsels against the government's argument.

16. The government has not challenged defendant's citation to *Cavin* in its several opportunities to brief the issue. Nevertheless, the Court notes that the Fifth Circuit's decision in *Cavin* relied on that court's earlier opinion in *United States v. Garber*, 607 F.2d 92 (5th Cir. 1979) (en banc). *Garber* reversed a tax evasion conviction because, in the court's judgment, the trial court had improperly excluded expert testimony on the question of whether income derived from the sale of a taxpayer's blood plasma was taxable. Although the Third Circuit has not specifically considered whether expert testimony on unclear law is admissible, a number of other courts have disagreed with the Fifth Circuit's holding in

Even without the support of the *Cavin* decision, the Court would have admitted testimony of the sort presented in Higgins' affidavit in rebuttal because the government presented testimony on the same issue through its own expert witness, Pearl Baylor, an import specialist with the ATF. Baylor testified at trial that an application for the importation of arms would have been denied if it listed the country of manufacture as South Africa. T., Nov. 13, 1992, at 19; App. at 845. According to Baylor, if the items in the application were transferred to a country where value was added, ATF would look to the "originating point" to determine the item's country of origin. T., Nov. 13, 1992, at 20; App. at 846. This testimony supported the government's argument that value added was not a legitimate concept. Defendant certainly would have been entitled to rebut that testimony by presenting an expert witness prepared to testify to the contrary. Importantly, for the Court's prejudice analysis, the expert witness defendant proposes is one who, as Director of ATF, was senior to the government's expert, Baylor. That certainly is a factor, favorable to defendant, the jury could consider in resolving conflicts in the testimony.

The government responds by arguing that Higgins was not involved, as was Baylor, in day-to-day decisions concerning applications for importation of defense articles, and that, presumably, Higgins' testimony would not be as credible as Baylor's.

The answer to the government's argument is that, because of counsel's ineffectiveness, the jury never heard Higgins' testimony or any other defense testimony from the ATF—to defendant's prejudice.

In addition to challenging Higgins' credibility, the government attacks the accuracy of the statements made in the affidavit. Specifically, the government argues that defining "substantial transformation" of a defense article as requiring labor or added material such that the article increases in value by thirty-five percent is incorrect. The government argues that the thirty-five percent figure does not appear in the regulations concerning importation of defense articles. This argument, however, misses the point of Higgins affidavit: the thirty-five percent figure does not appear in the regulations, because, as Higgins states, to his knowledge, there *are no regulations* specifying how ATF should define a defense article's country of origin. Because of the lack of guidance to ATF, Higgins asserts, ATF would look to Customs Service practices and rulings which support the definition of substantial transformation that Higgins explained in his affidavit.

Even if Higgins is incorrect in his explanation of the regulations, as the government argues, that does not change the Court's inquiry. In arguing the factual legitimacy of Higgins' affidavit, the government, as it does throughout its filings, misinterprets defendant's present claim. Defendant is not arguing in his habeas

*Garber. See, e.g., United States v. Harris,* 942 F.2d 1125, 1132 n. 6 (7th Cir.1991); *United States v. Curtis,* 782 F.2d 593, 599 (6th Cir. 1986); *United States v. Ingredient Tech. Corp.,* 698 F.2d 88, 96–97 (2d Cir.1983).

One of the essential problems with *Garber* identified in these subsequent decisions is that the analysis would permit "juries to find that uncertainty in the law negates willfulness whether or not the defendants are actually confused about the extent of their tax liability." *Ingredient Tech. Corp.,* 698 F.2d at 97.

Although the Court agrees with this criticism of *Garber,* it notes that the *Cavin* decision addressed the problem by admitting expert testimony only "as it relates to [the defendant's] understanding and resulting state of mind." *Cavin,* 39 F.3d at 1309. As will be discussed below, *see infra,* § IV.B.1.(a.)(ii.), defendant argues that he could have presented testimony that he did *in fact* believe that value added was a legitimate concept. That testimony would have laid a foundation for Higgins' testimony.

motion that the value-added concept was the definitive legal rule to apply to the case. The issue is not the *actual* legitimacy of the value-added concept.[17] The issue is whether defendant could have reasonably believed in the legitimacy of that concept. Defendant argues that he was reasonable in holding such a belief. Higgins testimony—regardless of its merits—would have lent considerable weight to defendant's assertions. Specifically, Higgins testimony would have allowed defendant to argue that if the director of the ATF thought the value added concept was applicable, defendant could have reasonably taken the same view. Such testimony would have enabled defendant to rebut the government's argument that the value added concept was "absurd."

For these reasons, the Court concludes that trial counsel's failure to present an expert witness on ATF procedures—whether it was Higgins or someone else possessing similar information—was prejudicial to defendant's trial defense.

### (ii.) Subjective belief in the value-added concept: testimony of John Kerns

In addition to requesting a witness like Higgins who would have shown the objective reasonableness of defendant's good faith as to the value-added concept, defendant specifically requested that trial counsel interview and call as a witness John Kerns, a Vice President of the Sikorsky Aircraft Division of United Technologies Corp. Defendant argues that Kerns' testimony would have demonstrated his *subjective* good faith—that is, that defendant actually held an honest belief that importa-

tion of the missile dummies was legal if sufficient value was added in Italy.

At trial, the only testimony suggesting defendant's subjective good faith came from defendant himself. Defendant testified that he discussed the value added concept with Greg Mansker, a lawyer with ISC, and asked Mansker whether ISC could legally import the Striker missile dummies. According to defendant, Mansker responded as follows:

> Greg got back to me and said that he, it was his opinion that, yes, we could comply with regulations if we did this and he gave me an analogy of a, I remember distinctly, an analogy of a car being assembled in Italy where all these various components would be coming from other manufacturers and other countries and it was the, the location of where all this assembly process was done that identified it as the last place of manufacture or the source of origin, origin.

T., Nov. 24, 1992, at 55; App. at 2203.

In its argument to the jury, the government responded to defendant's testimony regarding Mansker by suggesting that defendant had either "duped" Mansker, or that Mansker himself was involved in the conspiracy to illegally import the Striker missiles. T., Dec. 3, 1992, at 175–76; App. at 3387–88. Defendant presented no testimony at trial to rebut the government's argument. In support of his motion, defendant presented Kerns' affidavit, Def.'s Ex. 4, and argues that Kerns' testimony would have shown that a source external to ISC—and thus, not involved in the conspiracy—believed in the legality of import-

---

**17.** The Court's framing of the issue is not inconsistent with trial counsel's request for a charge on the value-added concept. Defendant's defense would have been most effective had the Court granted the request for such a charge. But, even without the charge on

value added, trial counsel was permitted to argue the objective reasonableness of defendant's understanding of the value-added concept. Higgins' testimony would have supported the latter position.

ing the missile dummies and communicated that belief to defendant.

Kerns worked with Sikorsky when ISC and Sikorsky were planning a program to evaluate whether the Striker missiles could be launched from helicopters. Kerns states in his affidavit that Sikorsky's "business policies demanded legal review of each program pursued to assure compliance with applicable United States and foreign government laws and regulations." Def.'s Ex. 4, at ¶ 3. Sikorsky conducted such a review on the Sikorsky ISC program, and, as Kerns explains:

> This review included discussions with the U.S. Export Licensing and Control Office and concluded that the Restrictive Countries Section concerning the Republic of South Africa would not have a bearing in this case, provided that any hardware imported would be of manufacture *or assembly* of the ISC Group in the United Kingdom or any country other than South Africa.

*Id.* at ¶ 4 (emphasis added).

A fair reading [18] of this statement compels the conclusion that Sikorsky's legal review led Sikorsky officials to conclude that importation of the Striker missiles would have been permissible under the relevant regulations. Defendant "was informed of the results of this review during the course of on-going program discussions in late July 1986." *Id.* at ¶ 5. Accordingly, had trial counsel interviewed and called Kerns as a witness as defendant requested, Kerns' testimony would have established that defendant received information about Sikorsky officials' views of the legality of importing the missile dummies from a source independent of ISC. In the first instance, this evidence would have corroborated defendant's testimony that he honestly believed in the value added concept. More importantly, though, in light of Kerns' independence of ISC, the evidence would have rebutted the government's argument that defendant had "duped" Mansker or that the value added concept was a creation of the ISC conspiracy.

The government raises several arguments in response to defendant's reliance on Kerns' affidavit. First, it argues that Sikorsky's analysis did not take into consideration the legal risk to ISC, but only considered the risk to Sikorsky. The government conceded at trial that Sikorsky could legally test missiles already imported into the United States. The charged illegal conduct, however, was the importation itself—a task controlled solely by ISC. For this reason, the government argues that Sikorsky's analysis said nothing about the legality of importing the missile dummies. As support, the government points to an August 15, 1986, letter from Sikorsky legal counsel addressed to ISC. The letter states that Sikorsky determined that it had "no risks related" to testing the materials imported by ISC, and Sikorsky "trust[ed] that [ISC] will comply with all applicable laws in connection" with the importation. Gov.'s Rep., App. at 1–2.

Although this letter provides the government with material for cross examination of Kerns, defendant presented an earlier internal Sikorsky memorandum,

---

**18.** It might be argued that Kerns' reference to "manufacture" would beg the question because components of the missile dummies were manufactured in South Africa-that is, the proviso in Kerns' statement leads to a conclusion that the missile dummies were not legally imported. It was undisputed at trial, however, that some of the missile components were combined-or "assembled"-to form a complete missile dummy in Italy. Hence, the Court's emphasis on Kerns' words: "or assembly." Because the missile dummies were assembled in a non-embargoed country, Italy, Kerns' statement hinging the legality of importation on "assembly" in "any country other than South Africa" supports defendant's argument.

dated July 18, 1986, which states that the missile dummies at issue, "though they may have originally been designed and developed by the Republic of South Africa, *would not be considered as such* providing, the missile(s) imported are a manufacture *or assembly* of ISC Group in the United Kingdom or any country other than the Republic of South Africa." Def.'s Rep., Ex. 1 (emphasis added). Significantly, the memorandum relied upon by defendant was addressed to the lawyer who drafted the later letter cited by the government. In light of these facts, defendant contends that the Sikorsky analysis was of a broader scope than that arguably described in the government's cited letter—that is, Sikorsky's legal review examined the legality of ISC's importation and reached a conclusion supporting defendant's good-faith defense.

To the extent the two cited documents conflict, they would create a question of fact about the scope of the Sikorsky legal analysis. Importantly, another part of Kerns' own testimony lends support to defendant's characterization, specifically, his statement that the "Restrictive Countries section concerning the Republic of South Africa would not have a *bearing in this case.*" Def.'s Ex. 4 at ¶ 4 (emphasis added). Notably, Kerns does not place any conditions on his conclusion that the Restrictive Countries section had no bearing, such that the conclusion would apply only to Sikorsky's legal risk. The Court therefore concludes that the government's evidence, which, if believed, would limit the scope of the Sikorsky legal analysis, does not negate the prejudice resulting from counsel's failure to interview and call Kerns as a trial witness.

The government next argues that defendant hid from Kerns details of the Striker program, including the involvement of South African engineers and the initial South African production of the missile bodies. The Court rejects this argument. Whatever information defendant may have hid from Kerns—if he in fact did so—is irrelevant to Kerns' conclusion that importation of the missile dummies was permissible so long as "any hardware imported would be of manufacture or *assembly* of the ISC Group in the United Kingdom or any country other than South Africa." Def.'s Ex. 4, at ¶ 4 (emphasis added). As discussed above, *see supra* note 18, the Court underscored the word "assembly," because even if, as the government argues, defendant hid the South African involvement in the production process, Kerns' affidavit states that missile assembly in another country would have rendered permissible the importation of the missile dummies into the United States.

The government also argues that Kerns' affidavit is irrelevant because defendant testified not to his reliance on Sikorsky's legal opinion but, rather, on Mansker's legal opinion. This argument, however, incorrectly assumes that defendant could have controlled the scope of his testimony at trial. On the contrary, his testimony was controlled by trial counsel's direct examination. As discussed above, *see supra* § IV.A., it is uncontested that trial counsel failed to pursue the lead provided by defendant and contact Kerns. Thus, the lack of testimony as to defendant's reliance on Kerns is attributable to trial counsel. The Court concludes that this government argument does not advance its position that defendant was not prejudiced by trial counsel's failure to interview and call Kerns.

The government's final argument is that Kerns' testimony would have been cumulative (and thus inadmissible) to defendant's own testimony about the legality of importing the missile dummies. The Court rejects this position in light of the government's argument at trial that defendant

did not support his good faith belief with any testimony other than his own. It is a well-accepted principle that a defendant is entitled to present testimony independently corroborating an asserted defense to the crimes charged. *See Nealy v. Cabana,* 764 F.2d 1173, 1179 (5th Cir.1985) (discussing, in *Strickland* prejudice analysis, the importance of testimony that would have supported the defendant's credibility as to facts underlying the defense). Defendant presented Kerns' proposed testimony for exactly that reason—independent corroboration. Had the government objected to Kerns' testimony on grounds that it was cumulative, the Court would have overruled the objection.

The government's arguments thus impact on, but do not negate, the importance of Kerns' testimony concerning defendant's good faith defense. Kerns, had he testified, would have given important support to defendant's argument that defendant held a subjective belief that the value-added concept allowed the importation of the Striker missile dummies. Trial counsel's failure to interview Kerns and call him as a trial witness thus had a significant prejudicial impact on defendant's case.

### (b.) Factual sufficiency of value added

The government did not limit its argument at trial to attacking the legitimacy of the value-added concept. The government also argued that, even if adding value to a missile dummy would change the country of origin of that missile, the work done in Italy on the missile dummies actually imported into the United States added only minimal value. Accordingly, the government argued, the facts of the case did not demonstrate sufficient transformation to change the missile dummies' country of origin.

Throughout trial, the parties focused on only one element that Elmer (the Italian corporation) added to the missiles—telemetry. The government introduced testimony that many of the missile dummies to be imported into the United States did not have telemetry and thus had no value added. *See, e.g.,* Testimony of Sandra Stehman, T., Nov. 12, 1992, at 170; App. at 812 (agreeing that fourteen missile dummies came "into the country with nothing added"). Based on this testimony and exhibits received in evidence, the government argued to the jury that "only [one] telemetry unit came into the United States in August of 1986," T., Dec. 3, 1992, at 78; App. at 3290, and that "Tom Jasin knew that only one telemetry unit was coming in." T., Dec. 3, 1992, at 79; App. at 3291. In sum, the government argued to the jury that a value added defense could not work in this case: "Even if you think that he was operating [on] a concept of value added, take a look at the numbers. And the numbers are that even buying into that, there's more South African content than there is Italian content. So the value added concept falls." T., Dec. 3, 1992, at 176; App. at 3388.

In addition to giving ammunition to the government for its closing argument, trial counsel's failure to pursue leads as to the sufficiency of the value added impacted the Court's denial of counsel's request for a jury charge on the value-added concept. Specifically, the Court concluded that because only one missile imported into the United States had telemetry added, and the other nine were apparently unchanged in Italy, the work done at Elmer did not, as a matter of law, result in a "new and different product." T., Dec. 2, 1992, at 184–85; App. at 3190–91.

In his habeas motion, defendant argues that had trial counsel followed his requests to investigate witnesses, he would have

been able to locate and call an expert witness who would have provided evidence that there *was* sufficient value added to the imported missiles. Additionally, defendant argues, had trial counsel followed defendant's requests to interview specific fact witnesses, one of those witnesses would have provided additional evidence with respect to the sufficiency of value added to the missile dummies. The expert witness, Robert Yates, a military missile expert, would have explained that there was value added to the missile dummies in other ways than just the assembly of telemetry units. The fact witness, William Gallagher, of Sikorsky, would have provided testimony as to his observation of the actual assembly process at Elmer and the amount of work put into the assembly.

### (i.) Expert testimony: Robert Yates

Defendant presents the affidavit of Robert E. Yates, a retired Colonel in the United States Army Reserve with a Ph.D. in electrical engineering, who served as a senior leader in a United States Army missile development program. *See* Def.'s Ex. 5. Yates is exactly the type of United States government expert that defendant specifically asked trial counsel to investigate. Had counsel followed up on defendant's request, and had he found Yates, given Yates' experience—he served as an advisor "on all recent U.S. Army missiles which are either presently used on helicopters or are under development for this type of launch"—he could have presented Yates as an expert witness. *Id.* at ¶ 2.

As an expert, Yates would have explained the results of his "qualitative assessment of the 'value added'" to the Striker missile dummies. *See id.* at ¶¶ 3–5 (explaining technical analysis of Striker missile dummies). Significantly, Yates'

qualitative analysis shifts the focus from telemetry to other value added at Elmer's facilities; in his expert opinion, the creation of a "surrogate missile" requires a great amount of engineering work "to correctly ballast the missile to ensure that the surrogate is dynamically and kinematically equivalent" to an armed missile. *Id.* at ¶ 4. This is the "domina[nt] expense" in creating a surrogate missile. *Id.* Upon studying the surrogate missiles that Elmer shipped to the United States, Yates found that "the value added by the Italian Company, Elmer ... would constitute at least 90% of the worth of the missile parts sent from South Africa to Italy, and subsequently imported or planned for importation, into the U.S." *Id.* at ¶ 6. In light of this finding, Yates concludes "that Elmer made significant transformation enhancements, exclusive of telemetry equipment, which exceeded 35% of the value of the South African parts imported into the United States." *Id.* at ¶ 7.

The import of Yates' potential testimony is clear. He explains that the value added in this case transcends the telemetry. It includes all of the engineering work necessary to create a surrogate missile.[19] He would have thus solidly rebutted the government's evidence that the missiles actually imported did not have sufficient value added to change the missile dummies' country of origin.

The government's only response to defendant's offering of Yates' affidavit is a declaration that Yates' conclusions are both "bogus" and unsupported by the evidence. Gov.'s Rep. at 32 n. 19. As for the government's statement that Yates' conclusions are unsupported by the evidence, that is not at all surprising. There is no evidence to support these conclusions because, as defendant argues, trial counsel

---

19. As discussed above, *see supra* § IV.B.1.(a.)(i.), the value-added concept

looked to value added in both materials costs and labor costs.

did not conduct any investigation that would have allowed him to present such evidence. In fact, defendant's argument relies on the lack of evidence in the record. It is Yates' testimony that would have supplied the necessary evidence.

As for the government's position that Yates' statements are "bogus," the government would have been entitled to cross examine him on how he reached his conclusions. The government's contention, however, does not negate prejudice resulting from trial counsel's failure to investigate a military missile expert. Again, the Court emphasizes that the inquiry for purposes of deciding defendant's habeas motion is whether defendant was prejudiced by trial counsel's failure to investigate, interview, and call at trial witnesses to support a good-faith defense. Even if Yates' conclusions were factually incorrect—an argument that the government supports with little more than its own unilateral declaration—defendant argues the inference to be drawn from Yates' testimony is the reasonableness of defendant's asserted good-faith beliefs. If an expert like Yates believed there was sufficient value added, the argument goes, it was reasonable for defendant to hold the same belief. The government's argument thus gives the Court no pause in reaching the conclusion that Yates' testimony would have supported defendant's good-faith defense.

### (ii.) Fact testimony: William Gallagher

Defendant also presents the affidavit of William Gallagher, a fact witness whom defendant specifically asked trial counsel to interview. *See* Def.'s Ex. 3. Gallagher's testimony would have filled a gap in the evidence presented at trial in that he would have been the only one to testify to his personal observations of Elmer's work on the Striker missiles.

Gallagher, like Kerns, *see supra* § IV.B.1.(a.)(ii.), was an employee of the Sikorsky Division of United Technologies Corp. While traveling in Italy, Gallagher was given a tour of the Elmer facility where he was able to personally observe the work Elmer was performing on the Striker missiles. *See* Def.'s Ex. 3. Gallagher's affidavit explains his observations as follows:

> While there, I observed an assembly area that seemed to be dedicated entirely to the STRIKER missile assembly. The room contained approximately twelve long tables and appeared to have a controlled clean room environment. The tables appeared to be positioned as an organized assembly line for the missile. The first table contained loose components and each table in line thereafter held assemblies of the missile in progressive order. The last two tables culminated in completed missiles. A fully assembled STRIKER missile was displayed in a plastic case on the last table.

*Id.*

Defendant argues that had Gallagher testified to his observations of this assembly process, defendant would have been able to argue that Elmer, by transforming component parts into a completed missile dummy, added value to every one of the missiles eventually imported to the United States. Defendant also argues that Gallagher's testimony would have provided evidence of more value added than telemetry—he states in his affidavit that he recalls "seeing a significant amount of orange wiring which would indicate telemetry *and instrumentation wiring* added to the missile components." *Id.* (emphasis added). The fact that Gallagher saw added instrumentation wiring—more than just telemetry—would have called into question the testimony the government presented suggesting that

only one imported missile had value (in the form of telemetry) added. Gallagher's testimony thus would have allowed defendant to rebut the government's argument that defendant could not have acted in good faith because insufficient value was added to the imported Striker missiles.

The government's only response to defendant's offering of Gallagher's affidavit is that his testimony would have been cumulative to other testimony presented at trial. The Court, however, agrees with defendant's argument that Gallagher's testimony would not have been cumulative. This conclusion is based on the fact that Gallagher would have been able to testify as to his actual observations of the work performed at Elmer. None of the witnesses suggested by the government to render Gallagher's testimony cumulative provide this perspective. On the contrary, most of the witnesses cited by the government merely testified to their knowledge that Elmer was adding telemetry to the missile dummies. *See, e.g.*, Testimony of General Robert Pointer, T., Nov. 20, 1992, at 84; App. at 1802; Testimony of David Ellis, T., Nov. 20, 1992, at 148; App. at 1866; Testimony of Scott Wagner, T., Nov. 13, 1992, at 63; App. at 889.

The only witness suggested by the government whose testimony involves personal observations of the missile dummies is that of government witness Phillip Ambrose. The government's citations to the record, however, only point to Ambrose's observations of telemetry *after* the missile dummies were imported to the United States. *See* T., Nov. 19, 1992, at 128–49; App. at 1636–57. This testimony is distinct from Gallagher's affidavit statements which explain the process of assembling the missile dummies. The distinction is an important one in light of Yates' explanation, *see supra* § IV.B.1.(b.)(i.), that a great proportion of the value added to the missile dummies was generated in assembly. In view of that distinction, Gallagher's testimony would not have been cumulative to Ambrose's.

Accordingly, the Court concludes that Gallagher's testimony would have provided defendant with much-needed—and non-cumulative—evidence that sufficient value was actually added to the missile dummies in Italy. This evidence would have contributed significantly to defendant's good faith defense based on the value-added concept. Trial counsel's failure to call Gallagher as a witness prejudiced defendant.

**2. Prejudice in Failure to Interview and Call at Trial James Guerin with Respect to the Exports Prong of the Conspiracy and Overall Innocence**

The government presented evidence and argued at trial that defendant was part of ISC's conspiracy to violate the AECA and CAAA in its exporting missile components to South Africa. Defendant's defense to this component of the charges against him was that James Guerin, who was the founder and Chief Executive Officer of ISC and the leader of the ISC conspiracy, informed defendant that ISC had "Washington approval" for the relevant export activity.

As discussed above, *see supra* § IV.A.1.(b.), defendant requested on two specific occasions that trial counsel interview Guerin to determine whether his testimony at trial would be helpful. Trial counsel failed to do so and Guerin never testified. Without Guerin's testimony at trial, the government was able to argue to the jury that defendant's claims of reliance on Guerin were not believable: "It's interesting, ladies and gentlemen, almost every piece of incriminating evidence in this case is blamed on Gerrin [*sic*] ... telling Tom Jasin that this was all okayed by Washington. He would have you believe they

thought that Washington approved all this based on Gerrin [sic]. . . ." T., Dec. 3, 1992, at 95; App. at 3307.

Defendant appends to his habeas motion documentation showing that had Guerin testified he would have indeed confirmed that he told defendant that ISC had approval for its export activities. *See* Def.'s Ex. 14. In a letter that Guerin prepared on defendant's behalf prior to defendant's trial, Guerin said with regard to the "South African Shipments": "I implied to Tom, as I did to several others, that we had Washington's 'blessings' on this activity. I interfaced a lot with Washington contacts and fed them a lot of information. But I did *not* have their approval for such shipments in writing. Jasin did not know this." *Id.* at 52.

The government argues that it conceded at trial that Guerin told defendant that ISC had Washington approval for its export activity. Its position at trial, the government maintains in its response to the motion, was that defendant could not have reasonably relied on Guerin's representations. For this reason, the government argues, Guerin's testimony would not have helped defendant's good faith defense. Additionally, the government argues, Guerin's testimony would have been cumulative to that of defense witness, James Shinehouse, who testified about his own conversations with Guerin on the question of Washington approval. *See* T. Nov. 30, 1992, at 149; App. at 2659 (testifying that Guerin "would state that the CIA is knowledgeable about ISC's activities and that it backs certain activities that ISC had").

The Court rejects the government's position. Guerin's testimony would not have been limited to the mere fact that he told defendant that ISC had Washington approval. Although Guerin would not have been permitted to testify, as he wrote in the letter quoted above, that "Jasin did not

know" that ISC actually lacked Washington approval, he could have testified to the circumstances of his interactions with defendant as well as his observations of defendant's work at ISC. Testimony on these points would have supported defendant's argument that he justifiably relied on Guerin's representations. Moreover, this testimony would not have been cumulative to Shinehouse's. The most relevant evidence concerning defendant's purported reliance would have been Guerin's testimony about his discussions with *defendant,* not with Shinehouse. In fact, the Court posed this idea to trial counsel, suggesting that Guerin's testimony would be the most relevant to defendant's reliance argument. *See* T. Nov. 30, 1992, at 114; App. at 2624 (Court's comments to trial counsel: "It seems to me that what is relevant is what Guerin told Jasin. So, if you want to bring in another defense witness, Guerin strikes me as the logical person."). Given the government's argument to the jury that defendant should not have relied on Guerin's statements, this testimony would have greatly aided defendant's case.

Perhaps even more important than his testimony on the narrow issue of exports, Guerin's presence at trial could have helped defendant's case in a more global respect. In the documents attached to defendant's motion, Guerin writes:

Jasin has no knowledge of, or participation in, *any* of the offenses for which I was charged. I *never* discussed any of those issues with him at any time; nor would he, in his position, have become involved in any of those offenses. . . . Frankly I have been somewhat mystified as to why any charges have been brought against him at all.

Def.'s Ex. 14 at 52 (emphasis supplied). In another letter, this one addressed to a friend, Guerin urged the recipient to have defendant's counsel call his own lawyer to prepare for any testimony that Guerin

might present at defendant's trial, stating that he "really [did] stand ready to help [defendant]." *Id.* at 51.

The government argues that this testimony could not have helped defendant's case because Guerin had a long history of lying, whether it was in his criminal activity with ISC or in his plea negotiations with law enforcement officials. Accordingly, the government argues, cross-examination of Guerin would have negated any helpfulness of Guerin's testimony.

The Court acknowledges that Guerin's credibility on some issues—those relating to his guilt—might be questionable. However, there is nothing in the record to suggest that Guerin's credibility was suspect as to defendant's involvement in the ISC conspiracy. That conclusion is based on the fact that Guerin, who pled guilty to charges arising out of the ISC conspiracy and was sentenced to fifteen years in prison, had strong incentives to name as many co-conspirators as he could. Every bit of assistance he gave to federal prosecutors might have resulted in a decrease in his sentence. *See* United States Sentencing Commission, *Guidelines Manual*, § 5K1.1 (allowing downward departure in sentencing upon defendant's substantial assistance to authorities). For Guerin to testify that defendant had no involvement in the ISC conspiracy would be squarely contrary to his interest. His statements against his penal interest thus have the ring of truth.

For the leader of a wide-ranging and long-running conspiracy to testify that, to his knowledge, the defendant had participated in no illegal activity would call into serious question the defendant's guilt. Failure to present any such evidence was certainly prejudicial to defendant.

### 3. Cumulative Prejudice

The Court must acknowledge that, as detailed in its previous opinion, the government presented at trial a good deal of evidence supporting its argument that defendant possessed the requisite state of mind to establish violations of the AECA and CAAA. *See Jasin,* 1993 WL 259436, at *2–10 (detailing government's evidence against defendant). Much of this evidence calls defendant's good faith into question. For example, the evidence showed that defendant arranged for false business cards to hide the fact that engineers he brought to a meeting to discuss the Striker program were South African. *See id.* at *9. The evidence also showed that defendant had several contacts with a licensing expert, James Fluhr, and that Fluhr gave defendant information that suggested that ISC could not legally import the missile dummies. *See id.* at *5. Additionally, the government introduced Sandra Stehman's testimony suggesting that defendant participated in the Striker program with no regard for the governing law. *See id.* at *7–8.[20]

---

**20.** The Court notes that a concurring opinion in the Third Circuit's affirmance of this Court's denial of defendant's Rule 33 Motion found the record to show that defendant "knew enough of the conspiracy to support his conviction." *Jasin,* 280 F.3d at 370 (Ambro, J., concurring). This statement does not, however, impact the Court's prejudice analysis. First, the Rule 33 Motion did not present the evidence which was missing from trial that defendant presents with his habeas motion. *See id.* at 370–71 (noting that affirmance of denial of Rule 33 Motion did not prevent defendant "from presenting evidence of his innocence in otherwise proper proceedings under 28 U.S.C. § 2255"). Additionally, the Rule 33 standard, which requires a defendant to show that new evidence not presented at trial "would probably produce an acquittal," *id.* at 361, is a much more stringent standard than the *Strickland* "reasonable probability" standard that applies in this habeas proceeding. *See Gray,* 878 F.2d at 710 (stating that *Strickland* "standard of proof is not as high as the standard applied to a motion for a new trial based on newly discovered evidence under Fed.R.Crim.P. 33, since,

The government points to all of this evidence in urging the Court to deny defendant's motion. The Court believes, however, that the government's vigorous opposition to defendant's motion is based on an inaccurate view of the law. The government says: "The fundamental questions presented to the Court are whether ... [the newly presented] evidence, if introduced, would have yielded an acquittal." Gov.'s Rep. at 33–34. That is incorrect. As the *Strickland* Court made clear more than seventeen years ago, the Court must ask whether trial counsel's ineffectiveness gives rise to a *reasonable probability* of a different result at trial.

In assessing whether defendant has shown such a reasonable probability, the Court is mindful of its statement at trial that, notwithstanding the government's evidence against defendant, this was a close case.[21] Defendant argues that, had trial counsel investigated and interviewed witnesses as defendant requested, the result of his trial might very well have been different. Upon reviewing the government's arguments at trial, and reading the affidavits appended to defendant's motion, the Court must agree with defendant. Each witness discussed above would have provided essential testimony to rebut the government's key arguments.

As to the imports prong of the conspiracy, the government argued to the Court and the jury that defendant could not reasonably believe in the legitimacy of the value-added concept because the ATF did not apply such an analysis. Moreover, the government argued that defendant did not actually believe in the concept. At trial, defendant had no supporting evidence to rebut these arguments. In support of the habeas motion, defendant presented two witnesses, Stephen Higgins and John Kerns, who would have provided such evidence.

The government also argued that, even if value added was a legitimate concept, there was no evidence of substantial transformation to support defendant's claim of a good faith belief in the legality of his conduct. The government is correct-trial counsel presented no such evidence. However, in support of his motion, defendant presented two witnesses, Robert Yates and William Gallagher, who would have provided such evidence.

As to exports, the government argued that defendant could not have reasonably relied on James Guerin's representations that ISC had government approval for its export activities. Once again, defendant had no evidence aside from his own testimony to rebut the government's position. Defendant demonstrates that Guerin not only could have helped establish the reasonableness of defendant's reliance, but also that he was eager to do so.

Most importantly, because of the government's vigorous arguments at trial that defendant was obviously guilty of the charged crimes, defendant's presentation of Guerin's statements that defendant, to Guerin's knowledge, was not involved in any conspiracy, convinces the Court that trial counsel's ineffectiveness in failing to call Guerin as a trial witness had a significantly negative impact on defendant's trial defense.

---

as the Court stated in *Strickland,* the high standard for newly discovered evidence claims presupposes there was an accurate and fair proceeding").

21. The Court is also mindful that defendant's trial counsel had never before tried a criminal case. The fact that trial counsel intended to defend a case such as this one-involving extraordinarily complex laws, regulations, and facts-by presenting no expert testimony and fact testimony from only four witnesses other than defendant is difficult to fathom.

Because the testimony of the witnesses proposed by defendant would have directly rebutted several of the government's key arguments to the jury, the Court concludes that trial counsel's ineffectiveness was "sufficient to undermine confidence in the outcome" of defendant's trial. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. Defendant has therefore satisfied the requirements of the *Strickland* prejudice analysis on the first ineffectiveness claim.[22]

## V. INEFFECTIVE ASSISTANCE OF COUNSEL BASED ON COUNSEL'S FAILURE TO OBJECT TO THE GOVERNMENT'S USE AT TRIAL OF DEFENDANT'S STATEMENTS MADE AND DOCUMENTS PRODUCED DURING PROFFER SESSIONS

■ Defendant argues that trial counsel was ineffective for a second reason-that he failed to object to the government's use during cross-examination of defendant's statements made and documents produced in two proffer sessions with government representatives, the first held on October 4, 1989, and the second on April 10, 1989. Those statements include defendant's assertions made in a sixteen-page hand-written document entitled "Chronology," *see* Def.'s Ex. 27 (hereinafter "Chron."), which defendant produced to the government during the second proffer session.[23] A number of the statements cited by defendant were recorded in writing by government lawyers or law enforcement agents during the sessions. In his motion, defendant cites nineteen statements that the government used at trial, all of which, defendant argues, were impermissibly used. *See* Def.'s App. A (setting forth

statements alleged to have been impermissibly used).

■ The threshold question in analyzing the ineffectiveness claim concerning use of the proffer statements by the government in cross examination of defendant is whether the statements were in fact inadmissible. Counsel cannot be considered ineffective for failing to object to the admission of admissible testimony. To evaluate the admissibility of the statements, the Court must first determine the agreement that existed between the parties during the two proffer sessions. As discussed below, the Court rejects defendant's contention that the sessions were "plea-related," and, accordingly, rejects defendant's argument that the statements were per se inadmissible under Fed.R.Crim.P. 11(e)(6). Instead, the Court concludes that the sessions were governed by the United States Attorney's Office's standard proffer agreement—an agreement that, in essence, allowed the government to use defendant's statements for impeachment and derivative purposes.

This conclusion does not end the matter. Even if defendant's statements were not objectionable under Rule 11(e)(6), counsel could have objected if they were used in violation of the standard proffer agreement. That agreement allowed the government to use defendant's statements if his testimony was "materially different" from the proffer session statements. Defendant argues that none of the nineteen statements cited in his motion were materially different from his testimony. The Court disagrees with defendant's assertions as to all but three of the statements; the Court finds that sixteen of the statements were permissibly used and do not

---

**22.** For this reason, the Court does not consider the purported prejudice caused by trial counsel's failure to interview Stehman, Gencavage, or Torrez.

**23.** Hereinafter, the Court's references to "defendant's statements" incorporate those statements made to the government in documents, including the Chronology.

support defendant's ineffectiveness claim. Although the Court concludes that three of the statements were impermissibly used, defendant has not demonstrated that such use amounted to prejudice under *Strickland.* For these reasons, which the Court discusses more thoroughly below, the Court does not grant defendant's § 2255 motion on this second ineffectiveness claim.

## A. THE UNITED STATES ATTORNEY'S OFFICE'S STANDARD PROFFER AGREEMENT APPLIED TO DEFENDANT'S STATEMENTS MADE DURING PROFFER SESSIONS WITH THE GOVERNMENT.

It is undisputed that the proffer sessions on October 4, 1989, and April 10, 1990, were conducted pursuant to an agreement concerning the government's use of defendant's provided information. However, there is no signed proffer agreement on record for those sessions, and the parties dispute the agreement's substance. The government contends that the sessions were conducted under the standard proffer agreement, which provides, in sum, for derivative and impeachment use of information gathered. Defendant argues that the sessions were plea-related, and the parties agreed that nothing defendant said could be used against him. The Court first addresses the issue of whether the sessions were plea-related. Upon its conclusion that the sessions were not plea-related, the Court examines the substance of the agreement governing the sessions.

### 1. The Proffer Sessions on October 4, 1989, and April 10, 1990, Were Not Plea–Related.

Defendant argues that the two proffer sessions were "plea-related" and, as such, the protections of Fed.R.Crim.P. 11(e)(6), unless waived, should apply. Rule 11(e)(6), which is substantively similar to

Fed.R.Evid. 410, *see United States v. Mezzanatto,* 513 U.S. 196, 200, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), provides:

> Except as otherwise provided in this paragraph, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions: (A) a plea of guilty which was later withdrawn; (B) a plea of nolo contendere; (C) any statement made in the course of any proceedings under this rule regarding either of the foregoing pleas; or (D) any statement made in the course of plea discussions with an attorney for the government which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.
>
> However, such a statement is admissible (i) in any proceeding wherein another statement made in the course of the same plea or plea discussions has been introduced and the statement ought in fairness be considered contemporaneously with it, or (ii) in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

Fed.R.Crim.P. 11(e)(6). The protections offered by this rule may be waived by a knowing and voluntary agreement. *See Mezzanatto,* 513 U.S. at 210, 115 S.Ct. 797 ("We hold that absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement rules is valid and enforceable.").

In asking the Court to find the proffer sessions plea-related, defendant asserts that the Court should follow the Fifth Circuit's rationale in *United States v. Robertson,* 582 F.2d 1356 (5th Cir.1978), which was adopted by a court in this district in

*United States v. Washington,* 614 F.Supp. 144, 149 (E.D.Pa.1985) (Shapiro, J.), *aff'd,* 791 F.2d 923 (3d Cir.1986).[24] *Robertson,* which was decided under the broader, former version of Rule 11(e)(6),[25] held:

> To determine whether a discussion should be characterized as a plea negotiation and as inadmissible, the trial court should carefully consider the totality of the circumstances.... The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.

*Washington,* 614 F.Supp. at 148–49 (quoting *Robertson,* 582 F.2d at 1366).

Many courts have held that Rule 11(e)(6) does not exclude statements made outside the formal plea bargaining process. *See Rachlin v. United States,* 723 F.2d 1373, 1377 (8th Cir.1983); *United States v. Ceballos,* 706 F.2d 1198, 1203 (11th Cir.1983). While the Third Circuit has not yet addressed the issue, *see United States v. Sebetich,* 776 F.2d 412, 422 n. 15 (3d Cir. 1985),[26] other courts have held that the rule "does not protect statements made in attempt to cooperate with the authorities, even in hope of inducing leniency from government [*sic* ], because cooperation with authorities does not qualify as plea bargaining." Jack B. Weinsten & Margaret A. Berger, *Weinstein's Federal Evidence* § 410.09[4] (Joseph M. McLaughlin, ed., 2d ed.2002). In sum, then, the Rule applies to statements made or documents produced "only when the defendant has made a plea or was a participant in plea negotiations." *Id.* at § 410.09[5].

At the August 9, 2001 evidentiary hearing, the Court heard a great deal of evidence concerning the two proffer sessions at issue. The first session, on October 4, 1989, was attended by Gerard O'Callaghan, a special agent with the Federal Bureau of Investigation who was assigned to defendant's case, Hr'g T. at 21, Brian Schellhase, then employed with the Defense Criminal Investigative Service ("DCIS"), Hr'g T. at 119–121, Assistant United States Attorney ("AUSA") Robert Goldman, defendant, and Gerald Martin, who was defendant's counsel at the time. According to the notes of that meeting prepared by Schellhase and dated October 6, 1989, the meeting concerned defendant's "involvement with the Striker Program, which International Signal and Control

---

**24.** The Court notes that *Washington* is the only federal case within the Third Circuit to cite *Robertson.* Moreover, no court in this circuit has cited Judge Shapiro's *Washington* decision.

**25.** Rule 11(e)(6) was amended in 1979 in order to narrow the scope of the evidentiary exclusion, which formerly covered all "statements made in connection with, and relevant to, any of the foregoing pleas or offers." *See United States v. Sebetich,* 776 F.2d 412, 421 (3d Cir.1985), *cert. denied,* 484 U.S. 1017, 108 S.Ct. 725, 98 L.Ed.2d 673 (1988) (reviewing legislative history of the amendment).

**26.** In *Sebetich,* the court ruled that statements made to a police chief "during an unplanned encounter in the American Legion parking lot, during the investigatory stage of the robbery ... when [the defendant] had not even been charged with a crime" were not made during Rule 11(e)(6) plea negotiations. *Id.* at 422. In so ruling, the court upheld the admission of the statements because (1) neither the defendant nor the government agent intended to reach a plea agreement during the discussions; (2) the defendant could not reasonably have believed that the agent had authority to plea bargain; and (3) the statements were not made to an attorney for the government. *See id.* at 421–22; *see also United States v. McNaughton,* 848 F.Supp. 1195, 1201 (E.D.Pa.1994) (Brody, J.).

Technologies, Inc. (ISC) had with South Africa." Def.'s Ex. 19 at 67.

The Court concludes that, in light of the testimony of defendant and his proffer session counsel, Martin, the October 4, 1989, meeting was not a plea negotiation session. Defendant testified that, as far as he knew, he "was always a cooperating Government witness." Hr'g T. at 150. He further testified:

> Q [by AUSA Goldman]: And in fact at this point in time in November or October of 1989 you didn't even consider yourself a suspect or a subject in this case, correct?
>
> A: That's right.
>
> Q: And so this meeting your recollection is that you were being called solely as a cooperative witness, correct?
>
> A: That's correct.

Hr'g T. at 166. Moreover, defendant's attorney at the time, Martin, explicitly testified that the October 1989 meeting "was not a plea discussion." Hr'g T. at 92.

Defendant's view of his position in the ISC investigation remained the same through the time of the April 10, 1990, proffer session—he still thought of himself as a cooperating witness rather than someone under investigation. That April 10, 1990, session was attended by defendant, Martin, Goldman, IRS Special Agent Maria Grabowski, and IRS Special Agent Amy Zalnik. *See* Def.'s Ex. 22 (memorandum of interview jointly signed by Grabowski and Zalnik). Although there is some evidence that defendant believed he possibly faced tax evasion charges,[27] he did not believe that he was a target of the ISC investigation. This conclusion is supported by defendant's testimony at the evidentiary hearing.

Q: By April 10th of 1990 were you concerned about the Government bringing charges against you?

A: Not in the ISC affair, no. Even-even on that April date Mr. Goldman referred to me as a cooperating Government witness, he wanted me as a Government witness, he wanted me to testify for the Government on the ISC matters.

Q: Was it—

A: But what—but what was the issue was the taxes. As far as the ISC charges or anything related to me criminally for my conduct at ISC, that never came up even through that last meeting with Mr. Goldman in April. And of course I didn't get—this thing never went through to the immunity that they had discussed. It seemed to me then that, well, I didn't do anything wrong, they determined I hadn't done anything wrong and they're still talking to me about being a Government witness. So I'm going to be a Government witness but I don't need immunity. But since they had talked to me about getting immunity before, I wanted it to extend to the tax situation.

Hr'g T. at 154–55.

Defendant's hearing testimony contradicts, in part, his Declaration in which he asserted that Goldman offered him a plea agreement: "Goldman stated that he would drop any ISC-related charges if I would plead guilty to two unrelated counts of felony tax evasion." Def.'s Decl. at ¶ 3. The contradiction is further demonstrated in the Memorandum of Interview prepared by Agents Grabowski and Zelnik, which states that AUSA Goldman promised only to report defendant's cooperation, but not to "drop any ISC-related charges." *See*

---

**27.** A two count indictment was handed down on August 8, 1995, charging defendant with one count of tax evasion in violation of 26 U.S.C. § 7201 and one count of filing a false tax return in violation of 26 U.S.C. § 7206(1) for calendar year 1987. These counts were dismissed on November 1, 1995, on motion of the government.

Def.'s Ex. 22 at 88 ("Goldman further advised Jasin, that should Jasin decide to enter into a plea agreement with the government, Goldman would notify the appropriate officials of Jasin's cooperation in the investigation."). Thus, defendant's Declaration is the only evidence supporting a conclusion that the government offered a plea agreement at the April 10, 1990 meeting.

There is substantial evidence that, as of April 10, 1990, defendant thought of himself as a cooperating witness with respect to the ISC conspiracy. He only wanted immunity from the tax charges in exchange for information on the ISC conspiracy. This does not amount to a "subjective expectation to negotiate a plea at the time of the discussion" that would implicate Rule 11(e)(6). *Washington,* 614 F.Supp. at 148.

Therefore, the Court concludes that, upon consideration of the totality of the circumstances surrounding the meetings, both the October 4, 1989, and April 10, 1990, proffer sessions were not plea-related negotiations, and the protections of Rule 11(e)(6) do not apply.

## 2. Substance of the Proffer Agreement

Proffer sessions conducted by the United States Attorney in the Eastern District of Pennsylvania are generally conducted under the terms of a standard proffer agreement. The standard proffer letter, which is directed to counsel, provides in relevant part:

First, no statements made by you or your client, or other information provided by you or your client during the "off-the-record" proffer or discussion will be used directly against your client in any criminal case. Second, the government may make derivative use of and may pursue any investigative leads suggested by any statements made by or other information provided by you or your client. . . . Third, in the event your client is a witness at any trial or other legal proceeding relating to the above captioned matter and offers testimony *materially different* from any statements made or other information provided during the "off-the-record" proffer or discussion, the attorney for the government may cross-examine your client an [*sic*] introduce rebuttal evidence concerning any statements made or other [information] provided during the "off-the-record" proffer or discussion. This provision is necessary in order to assure that your client does not abuse the opportunity of an "off-the-record" proffer or discussion, does not make materially false statements to a government agency, and does not commit perjury when testifying at trial.

Furthermore, your client expressly waives any right to challenge the derivative use of such statements. It is the intent of this agreement that such derivative use is proper and the government and your client hereby agree that Federal Rule of Criminal Procedure 11(e)(6) and Federal Rule of Evidence 410 do not govern such derivative use.

Def.'s Ex. 50 (emphasis added).

Defendant contends that the October 4, 1989, and the April 10, 1990, meetings were not conducted under the standard proffer agreement. Instead, he argues there was an agreement that nothing he said in those meetings could be used against him in any way. The Court finds that the totality of the evidence compels rejection of defendant's position.

According to the written report of the October 4, 1989, proffer session prepared by Schellhase, the session was conducted under a proffer agreement. Def.'s Ex. 19 at 67. Although the report does not set forth the terms of that agreement, O'Callaghan, who also attended the October 4,

1989, meeting, testified at the hearing that he remembered the terms of the proffer were discussed. Hr'g T. at 26. This recollection is supported by O'Callaghan's affidavit dated July 27, 1992, in which he stated:

> Jasin was advised that any statements made by him during the proffer would not be used directly against him in a criminal case. Jasin was advised that the government could make derivative use of any information received from Jasin and follow any leads developed as a result of the interview. Jasin was advised that if, at a later date, he were to testify to a matter materially different than that stated during the proffer, that the government could use the proffer statement to cross examine him. Jasin was advised that under these terms of the proffer, he waived his right to challenge all derivative use of any information providerd [sic] by him or his counsel. Jasin and his counsel agreed to the terms of the proffer agreement and proceeded with the interview.

Def.'s Ex. 53 at ¶ 7. Significantly, the terms of the verbal agreement as O'Callaghan recalled them substantially mirror those of the standard proffer agreement.

In contrast to O'Callaghan, Martin, defendant's counsel during the proffer sessions, has a less clear recollection of the terms under which the proffer sessions were conducted. First, he testified that to a "reasonable degree of certainty," it was his recollection "that the Government had no problem with agreeing that they wouldn't make derivative use of what Mr. Jasin said to them." Hr'g T. at 63–64. He stated that at the time of the proffer sessions, it was his practice to ask for an agreement preventing derivative use. Hr'g Tr. at 66–67. He also stated in a 1995 affidavit that he "insisted on and received assurances that the Proffer Agreement did not have the derivative use clause." Def.'s Ex. 1 at ¶ 9. However, in

his hearing testimony, Martin testified that he viewed this request as a "throwaway," to see where his client was on the government's "radar," meaning that regardless of whether the government agreed to his request, he would have advised his client to continue the proffer session. Hr'g T. at 66–67.

Perhaps the most telling evidence on the issue is found in representations made by trial counsel during an October 21, 1992, suppression hearing. Trial counsel had initially moved for "suppression of all statements made by Thomas Jasin, return of all documents produced by him in connection with proffer and suppression of leads obtained from him as a result or arising out of governmental interviews of Thomas Jasin pursuant or related to a proffer agreement." Defendant's Motion for Suppression of Evidence (Doc. No. 14, filed March 24, 1992). However, at the hearing on the motion, trial counsel reported to the Court:

> ... I have arrived at a conclusion as has Mr. Martin, quite frankly, that the suppression motion is not appropriate
>
> . . . .
>
> ... Mr. Martin confirms to me that in discussions with Mr. Goldman on behalf of the Government and notwithstanding the absence that a letter, although promised, was never executed, it was quite clear in those discussions with Mr. Goldman that whatever Mr. Jasin may have said at those meetings at which Mr. Martin was present, one thing was clear and that was the Government had made the meetings conditional. . . .
>
> First, the commitment by Mr. Martin which he again confirms to be that notwithstanding any provided detail or information by Mr. Jasin to the Government, the Government would not be precluded from any derivative use of the material so provided nor would the Government be limited in terms of its abili-

ty to follow up any leads with regard to that information as provided.

. . . .

So that I think it is patently self-evident under the law that our motion for suppression is improper.

Oct. 21, 1992, Hr'g T. at 5–7. In sum, trial counsel represented to the Court that, based on his discussions with Martin, the government would not be precluded from derivative use of defendant's proffer-session statements.

A letter sent by Martin to defendant on September 1, 1995, lends further support to the conclusion that the two sessions were conducted under the standard proffer agreement. Gov.'s Ex. 4.[28] In that letter, Martin wrote: "While I cannot recall ever receiving a 'proffer' letter, I have a clear recollection of discussing it, and the terms under which you'd talk to them, with Mr. Goldman. One of those terms was that so long as you were truthful, nothing would be used against you." *Id.* The obvious negative implication of Martin's statement is that defendant's statements *could* be used against him. The Court finds the weight of the evidence compels the conclusion that Martin knowingly entered into an agreement that did in fact allow derivative use.

Despite the weight of this evidence, defendant asserts his own belief that the government could not use any information given at the proffer sessions against him. The assertion, however, is contradicted by defendant's own statements in a letter he wrote to Martin in February 1990. Specifically, in his February 19, 1990, letter, defendant stated, in reference to the October 4, 1989, proffer session:

Later in the questioning when they weren't sure I was being forthright, Mr. Goldman interrupted the questioning to get my attention to have me understand that I must not lie in order for immunity to be good, because if they find out from other investigations & interviews dishonesty on my part, I will lose the protection & they could use the information against me.

Gov.'s Ex. 2. This letter shows that defendant understood the government to have reserved the right to use his statements in a derivative fashion.

The Court also notes that, in another letter, dated August 6, 1990, defendant wrote to Martin, in reference to the October 4, 1989 proffer session, "Goldman tells me nothing I provide or say will be used against me—he says were [sic] on the same side—and that a profer [sic] will protect me until they decide whether I did anything wrong at which time I will get immunity for my continued cooperation, but this couldn't be determined until after their question & answer sessions." Def.'s Ex. 56.

To the extent that defendant's statements contradict each other, the Court concludes that the earlier letter more completely sets forth defendant's understanding of the terms under which the proffer sessions were held—in essence, that if he testified, the government could use the information against him. The Court reaches this conclusion in light of the other testimony presented on this issue—namely, that of O'Callaghan and Martin.

Upon reviewing the circumstances surrounding the proffer sessions, and the testimony and documents entered into evidence, the Court concludes that the October 4, 1989, and April 10, 1990, proffer statements were governed by the stan-

**28.** The government's exhibits were introduced at the August 9, 2001, hearing and oral argument.

dard proffer agreement. The government was prohibited from using any information directly against defendant at trial, but it was permitted to make derivative use of his statements and use the statements on cross-examination if defendant "offer[ed] testimony materially different" from those statements. Def.'s Ex. 50.

## B. THE GOVERNMENT'S USE OF DEFENDANT'S PROFFER STATEMENTS DOES NOT SUPPORT A CLAIM FOR HABEAS RELIEF.

As an alternative to his argument that all of the nineteen statements set forth in Appendix A were per se inadmissible pursuant to Fed.R.Crim.P. 11(e)(6), defendant argues that the statements were improperly used under the standard proffer agreement. This argument is based on defendant's position that he did not offer testimony "materially different" from his proffer-session statements.

The parties focus much of their argument on the standard the Court should apply in evaluating the propriety of the government's using each statement. The Court will address this issue and then apply the appropriate standard to defendant's nineteen cited statements.

### 1. Governing Standard: Meaning of "Materially Different"

Defendant argues that the phrase, "materially different," which appears in the government's standard proffer agreement, is equivalent to the phrase, "inconsistent statement," as that term is defined in the Federal Rules of Evidence. *See* Fed. R.Evid. 613(b); Fed.R.Evid. 801(d)(1)(A). Because the government does not contest this point, the Court will treat the proffer agreement as allowing the government to use defendant's proffer statements for im-

peachment purposes upon a showing of inconsistent testimony.

The question then becomes how to evaluate whether testimony is inconsistent with a prior statement. Defendant urges the Court to adopt a narrow view of inconsistent statements, citing as support, the Seventh Circuit's decision in *United States v. Krilich,* 159 F.3d 1020, 1025–26 (7th Cir.1998). In *Krilich,* the court stated that "[s]tatements are inconsistent only if the truth of one implies the falsity of the other." *Id.* Defendant's application of this standard suggests a strict, black-and-white approach. For nearly all of the defendant's nineteen cited statements, defendant claims that they were improper because defendant never testified in a manner directly contradictory with those statements. Given his analysis, the Court understands defendant to be arguing that inconsistency under the Federal Rules of Evidence requires defendant to have, at one time, said "X is true" and then testified "X is not true."

In contrast to defendant's narrow approach, the government cites a number of decisions holding that " 'statements need not be diametrically opposed to be inconsistent.' " *United States v. Agajanian,* 852 F.2d 56, 58 (2d Cir.1988) (quoting *United States v. Jones,* 808 F.2d 561, 568 (7th Cir.1986)); *see also United States v. Moore,* 149 F.3d 773, 781 (8th Cir.1998). Rather, statements are sufficiently inconsistent for impeachment purposes if the testimony, "taken as a whole, either by what it says or by what it omits to say, affords some indication that the fact was different from the testimony of the witness whom it is sought to contradict." *United States v. Barrett,* 539 F.2d 244, 254 (1st Cir.1976) (citation omitted).

This broad standard appears to be universally accepted.[29] As one treatise states:

---

29. The Third Circuit has not explicitly con- firmed its approval of a broad view of in-

"The courts do not limit a finding of inconsistency to situations in which the witness has given diametrically opposed answers. In general, almost any substantive divergence between two statements has sufficed to permit the use of the prior statement." *Weinstein's Federal Evidence* § 801.21[2][b]. The Court may view a statement as inconsistent "if under any rational theory it might lead to any relevant conclusion different from any other relevant conclusion resulting from anything the witness said." *Id.* at § 613.04[1]. Moreover, "[a] statement may be inconsistent when read with other material and yet not flatly contradict a prior statement of the witness." *Id.* Wigmore has stated a similarly broad test, suggesting that a

court ask: " 'Do the two expressions appear to have been produced by inconsistent beliefs?' " Michael H. Graham, 2 *Handbook of Fed. Evid.* § 613.2 (5th ed.2002) (quoting Wigmore, *Evidence* § 1040 (Chadbourn rev.1970)).

■ The foregoing authority supports the government's position that a witness' prior statement is inconsistent and, thus, properly used for impeachment purposes, even if it only can be used to challenge the grounds or bases of a witness' testimony. Because defendant's suggested standard is much narrower than that permitted by nearly every court to address the issue, the Court will not adopt that standard.[30]

consistent statements, but it has cited with approval the Second Circuit's decision in *Agajanian*, which did adopt such a standard. *United States v. Wali*, 860 F.2d 588, 591 (3d Cir.1988) (citing *Agajanian*, 852 F.2d at 58–59).

**30.** The Court finds further support for this conclusion in the *Krilich* decision, the very case cited by defendant to support a narrower standard. Close reading of that case leads the Court to conclude that defendant reads too narrowly that court's stated standard for inconsistency-that "[s]tatements are inconsistent only if the truth of one implies the falsity of the other." *Krilich*, 159 F.3d at 1025–26. First, the court clarified its stated standard at another point in the opinion, providing that "[i]mpeachment of a witness need not be 'contrary to' or 'inconsistent with' a defendant's admission of guilt in a bargaining proffer." *Id.* at 1025. Second, in its application of the standard to the statements at issue, the court adopted a view similar to that discussed in the above authorities.

*Krilich* involved a prosecution for violations of the Racketeer Influenced and Corrupt Organizations statute, 18 U.S.C. § 1962(d), and a fraud statute, 18 U.S.C. § 1014. *Id.* at 1024. The defendant was accused of faking a hole-in-one on the ninth hole of a golf course so as to win $40,000 in a hole-in-one contest. *Id.* The $40,000 in winnings resulted in a payoff to a local political leader who then agreed to support a bond payout that would

finance an apartment complex to be built by the defendant. *Id.* Prior to trial, the defendant participated in plea negotiations with the government but waived his rights under Fed. R.Crim.P. 11(e)(6), thereby allowing the government to use the defendant's plea-related statements for any purpose should they be "inconsistent" with the proffer. *Id.* at 1025. During a proffer session, the defendant admitted that he faked the hole-in-one at the ninth hole. *Id.* Several of the defendant's witnesses, however, testified on direct examination that the ninth hole was close to the clubhouse and easily observed. *Id.* at 1026. The inference to be drawn from such testimony, the court explained, was that "no one would attempt to fake a hole-in-one there." *Id.* This inference was inconsistent with the proffer, the court held, and the defendant's proffer admission was properly introduced. *Id.*

The *Krilich* court thus clearly did not adopt the defendant's suggested approach, that testimony directly contradict defendant's proffer statements to open the door to the government's using the proffer. An inference that one would not sensibly fake a hole-in-one at a hole easily observed does not, by any means, contradict an admission of actually faking the hole-in-one. Nevertheless, testimony leading to that inference properly opens the door to use of a proffer statement because the grounds or bases underlying the two assertions are inconsistent.

In evaluating defendant's cited statements, the Court will be guided by the principles discussed above, which, in sum provide that "any substantive divergence between two statements" is "suffic[ient] to permit the use of the prior statement." *Weinstein's Federal Evidence* § 801.21[2][b].

## 2. Evaluation of Defendant's Cited Statements

Applying the above discussion of the standards for evaluating inconsistencies, the Court finds that all but three of defendant's cited statements were permissibly used because the underlying bases for defendant's testimony[31] were inconsistent with his proffer statements.

The majority of the cited statements concern defendant's knowledge of James Guerin's fraudulent financial activity. Def.'s App. A at Statements 1–5, 7–9. A number of others concern defendant's knowledge of Guerin's and Clyde Ivy's[32] illegal conduct or biases toward South Africa's apartheid regime. *Id.* at Statements 11, 12, 14, 17–19. The government argues that its use of defendant's statements as to financial fraud, illegal conduct, or biases all relate to defendant's asserted good-faith defense to the exports prong of the conspiracy. Defendant supported this de- fense, the government explains, by testifying a number of times that Guerin represented to him that ISC had "Washington approval" for its export activities. *See, e.g.,* T. Nov. 24, 1992, at 70–71; App. at 2218–19 (defendant's testimony that Guerin assured him of ISC's "special channels and Washington approval" in relation to the export activity). Moreover, defendant testified that he had no reason to disbelieve Guerin's claims about such Washington approval, stating: "He told me. I believed it, why wouldn't I believe it?" T., Nov. 30, 1992, at 60; App. at 2570.

Defendant argues that he never testified at trial regarding Guerin's financial fraud or other wrongdoing by Guerin and Ivy and thus did not open the door to the government's use of his proffer statements. The government counters that defendant's knowledge of such fraud and wrongdoing is inconsistent with defendant's asserted reliance on Guerin. The Court agrees with the government. Defendant's proffer statement references to fraud and wrongdoing, although not directly contradictory to his testimony as to reliance, are inconsistent with the *premise* underlying such reliance. That defendant might have known about Guerin's and Ivy's wrongdoing gives reason to doubt that defendant reasonably believed Guerin's assurances.[33] As the government

---

**31.** Defendant argues with respect to some of the statements that they were impermissibly used because they are only inconsistent with testimony first introduced on cross examination. The proffer agreement, defendant argues, should only allow defendant to open the door to impeachment by proffer statements with inconsistent testimony on direct examination. The Court rejects this argument as it flatly contradicts the language of the standard proffer agreement. That agreement provides for derivative use of the proffer statements if defendant "offers *testimony*" materially different from the proffer statements. Def.'s Ex. 50 (emphasis added). The agreement does not, in any way, condition "testimony" to include only testimony given on direct examination.

The Court concludes that "testimony" should be given its natural meaning-that is, testimony upon any form of examination.

**32.** Clyde Ivy was the President of ISC and a key figure in the ISC conspiracy.

**33.** The Court notes that its finding here does not impact its conclusion above, *see supra* § IV.B.2, that trial counsel's failure to interview Guerin and present him as a trial witness prejudiced defendant's case. Had Guerin testified to facts supporting defendant's reliance on him, defendant would have been able to rebut evidence derived from the government's cross examination on that same point.

explains, much of the challenged cross examination simply sought to answer defendant's rhetorical question: "I believed it, why wouldn't I believe it?" *Id.* The Court concludes that such cross examination was proper.

Because all of the statements concerning Guerin's and Ivy's fraud and wrongdoing are substantially similar, the Court will not analyze each statement independently; analysis of one example will suffice. In Statement 9, defendant, writing about his apparent growing recognition in 1986 of ISC's fraudulent financial activity wrote: "The more I tried to understand the numbers, the more uncomfortable I became." Def.'s App. A at Statement 9 (quoting Chron. at 9). On cross examination, the government asked defendant to read this statement from his Chronology. T., Dec. 1, 1992, at 149; App. at 2873. Defendant argues that this cross examination was improper because defendant never testified inconsistently. The Court disagrees with defendant. The fact that defendant was "uncomfortable" with ISC's financial numbers in 1986, numbers over which Guerin had control, is inconsistent with a premise underlying defendant's asserted reliance on Guerin—that defendant could reasonably trust Guerin's honesty during the same time period.

Defendant raises a separate argument with respect to this statement and others relating to Guerin's and Ivy's fraud or wrongdoing. Impeachment with the Chronology is improper, defendant argues, because it was written in 1990 with the benefit of hindsight and thus does not reflect defendant's state of mind during the relevant time period. The Court rejects this argument because the statements themselves reflect that defendant was writing about his past state of mind, and that he did not do so in a reflective manner. Statement 9, quoted above, shows that defendant was uncomfortable with ISC's num-

bers *in 1986.* Had defendant been writing in a purely reflective sense, he might have said something to the effect of: "In retrospect, the numbers in 1986 seemed a bit strange." Defendant did not, however, say this. The Court thus concludes that defendant's statements are probative of his state of mind during the relevant time period.

In addition to the government's cross examination as to defendant's reliance on Guerin, defendant points to a number of statements that he alleges were improperly used. First, the government cross examined defendant based on its interview notes of the October 4, 1989, proffer session concerning defendant's description of his trip to South Africa to correct a simulation procedure, identified as Statement 15. *See* Def.'s Ex. 19 at 77. Early in cross examination, the government points out, defendant testified that he was not involved in technical matters. T., Dec. 1, 1992, at 19; App. at 2743. Thereafter, the government cross examined defendant using his proffer statement concerning his trip to South Africa to resolve a simulation problem. T., Dec. 1, 1992, at 81; App. at 2805. Defendant argues that this earlier testimony about not being involved in technical matters was not inconsistent with later testimony that he resolved a simulation problem. The Court disagrees. These statements are indeed inconsistent.

Next, in Statement 16, the government cross examined defendant using its own notes of the October 4, 1989, proffer session concerning defendant's reference to Guerin's one-time assertions of CIA connections. Def.'s Ex. 19 at 75. After defendant testified that Guerin mentioned Washington approval on a number of occasions, as opposed to on one occasion, the government used its notes to cross examine. T., Dec. 1, 1992, at 60; App. at 2784. Again, the Court disagrees with defen-

dant's argument that there were no inconsistencies. Defendant's proffer statement that Guerin told him of Washington approval once is indeed different from his testimony that Guerin told him a number of times. Moreover, even if this cross examination might be viewed as improper, it was not prejudicial because defendant had an opportunity to explain the inconsistency. Specifically, defendant answered by explaining that the statement at the October 4, 1989, meeting concerned his conversations with Guerin when defendant began working with ISC; his testimony about repeated mentions of Washington approval, however, involved conversations after defendant had worked with ISC for some time. *See* T., Dec. 1, 1992, at 60–62; App. at 2784–86.

For the reasons stated above, sixteen of the nineteen statements cited by defendant were not improperly used by the government. However, the Court finds three instances of improper cross examination based on defendant's proffer session statements.

The first is Statement 6, defendant's Chronology statement that he kept up to date on changing regulations involving South Africa by communicating with licensing expert, James Fluhr. Chron. at 4. The government read this statement to defendant on cross examination, T., Dec. 1, 1992, at 27–31; App. at 2751–55, and asserts that defendant opened the door to such cross examination by testifying that he only spoke with Fluhr about export regulations, and not import regulations. T. Nov. 25, 1992, at 92; App. at 2384. The Court, however, does not find an inconsistency between these statements. The fact that defendant claims he spoke to Fluhr

about exports, and not imports, does not call into question the fact that he kept in touch with Fluhr on a regular basis. If nothing else, defendant's testimony served as an amplification of his chronology statement. Such an amplification does not open the door to cross examination under the proffer agreement.

Notwithstanding the fact that the government's cross examination on this point was improper, trial counsel's failure to object to it did not prejudice defendant. This conclusion is based on the fact that the government offered other similar evidence of defendant's communications with Fluhr independent of that in his proffer statements. *See* T., Nov. 25, 1992, at 89–92; App. at 2381–84 (introduction of and testimony on government's exhibit portraying communication between Fluhr and defendant). The government used this evidence to argue that defendant knew the law governing importation of munitions.[34] Because the government had other evidence of defendant's communications with Fluhr aside from the communications detailed in the cross examination to which defendant objects, the Court finds that the government's improper use of Statement 6 did not prejudice defendant.

 Next, and finally, the Court finds the government's use of Statements 10 and 13 improper. Both of these statements involve defendant's knowledge of Guerin's and Ivy's wrongdoing. In contrast to the statements discussed above involving Guerin's assurances of Washington approval, these statements involve discussions with Ivy and Guerin that occurred *after* the relevant time period— that is, after defendant's involvement in

---

**34.** This conclusion does not impact the Court's earlier conclusion, *see supra* § IV.B.1.(a.), that trial counsel's failure to investigate and interview witnesses with respect to the legitimacy of the value added concept

prejudiced defendant's case. Defendant could have used that missing testimony to explain how Fluhr's communications did not fully answer questions concerning the Striker program's legality.

the Striker program. For this reason, the information defendant reported in Statements 10 and 13 had no bearing on defendant's state of mind during his involvement in the Striker program. The statements, thus, were not inconsistent with defendant's asserted reliance on Guerin. Trial counsel could have—and should have—objected to their use.

Nevertheless, the government's use of the Statements 6, 10, and 13 did not prejudice defendant's case. Defendant's only argument that there was prejudice from the government's improper use of the statements is that the government used the statements to connect defendant to fraudulent activity unrelated to the charges against him. As the Court has already discussed, however, the government could properly cross examine defendant with his proffer statements concerning fraudulent activity as long as those statements were probative of his state of mind during the relevant time period. The jury, therefore, heard permissible cross examination on Guerin's and Ivy's wrongdoing. The fact that the jury heard two more of defendant's statements on the same subject does not result in a reasonable probability that trial counsel's failure to object would have led to an acquittal.

Defendant places great emphasis on the prejudicial nature of Statement 10, in which defendant relates a discussion with Ivy, in which Ivy told defendant that defendant's predecessor, among other things, faked invoices, billing documents, and purchase orders to "generate[ ] the required financial performance." Chron. at 10. The government referred to this statement numerous times on cross examination, asking defendant about Ivy's telling him to "cook the books." T., Nov. 25, 1992, at 131; App. at 2423; see also T., Dec. 1, 1992, at 59; App. at 2783. Although the government's use of this statement did indeed inject a negative element into the

defense, the Court does not find it sufficiently prejudicial. As stated, the Court concludes that the sum total of permissible cross examination on Guerin's and Ivy's wrongdoing made the jury well aware of fraudulent activity at ISC. Thus, the government's cross examination on "cooking the books" had little or no harmful impact on defendant over and above the harmful impact of the government's permissible cross examination.

For these reasons, the Court concludes that defendant's second claim in support of his habeas motion fails.

## VI. CONCLUSION

Defendant's motion under § 2255 will be granted on defendant's first claim that his trial counsel was ineffective in failing to investigate, interview, and call witnesses. The motion will be denied on defendant's second claim relating to the government's cross examination of defendant using defendant's proffer-session statements.

An appropriate order follows.

### ORDER

**AND NOW,** this 8th day of August, 2002, upon consideration of Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 (Doc. No. 230, filed Jan. 23, 2001); all related filings; and an August 9, 2001, evidentiary hearing and oral argument, for the reasons stated in the foregoing Memorandum, **IT IS ORDERED,** as follows:

1. Defendant's Motion to Vacate, Set Aside or Correct Sentence Under 28 U.S.C. § 2255 is **GRANTED IN PART** and **DENIED IN PART,** as follows:

(a) The Motion is **GRANTED** with respect to defendant's claim that his trial counsel was ineffective in failing to investigate, interview, and call at trial witnesses

with evidence in support of defendant's good-faith defense;

(b) The Motion is **DENIED** with respect to defendant's claim that his trial counsel was ineffective in failing to object to the government's cross examination of defendant based on defendant's proffer-session statements;

2. Defendant's conviction on December 10, 1992, and the Court's Judgment and Commitment Order dated July 16, 1998 (Doc. No. 185, filed July 17, 1998) are **VACATED** and **SET ASIDE;**

3. The government shall, within thirty days of the entry of this Order, advise defendant and the Court whether it intends to **RETRY** defendant; if the government intends to **RETRY** defendant, the trial shall commence within seventy days of the entry of this Order.

**IT IS FURTHER ORDERED** that defendant's Renewed Motion for Bail Pending Disposition of Defendant's 2255 Motion (Doc. No. 232, filed Jan. 23, 2001) and Second Renewed Motion for Bail Pending Disposition of Defendant's 2255 Motion (Doc. No. 251, filed May 9, 2001) are **DENIED AS MOOT** without prejudice to defendant's right to file a motion seeking his release on bail pending further proceedings.